## The GREAT ATLANTIC & PACIFIC TEA COMPANY, INC., Petitioner,

v.

## FEDERAL TRADE COMMISSION, Respondent.

No. 922, Docket 76–4179.

United States Court of Appeals, Second Circuit.

Argued March 24, 1977.

Decided June 21, 1977.

Denis G. McInerney, New York City (Cahill Gordon & Reindel, Raymond L. Falls, Jr., Thomas F. Curnin and Ira J. Dembrow, New York City, on the brief), for petitioner.

W. Baldwin Ogden, F. T. C., Washington, D. C. (Robert J. Lewis, Gen. Counsel, Gerald P. Norton, Deputy Gen. Counsel, and Jerold D. Cummins, Acting Asst. Gen. Counsel, F.

T. C., Washington, D. C., on the brief), for respondent.

Before ANDERSON and MESKILL, Circuit Judges, and MARKEY, Chief Judge, U. S. Court of Customs and Patent Appeals.*

ROBERT P. ANDERSON, Circuit Judge:

This is a petition for review of an order of the Federal Trade Commission (FTC or the Commission) in the matter of *The Great Atlantic & Pacific Tea Co., Inc.,* —— F.T.C. —— [1973–76 Transfer Binder] CCH Trade Reg.Rep. ¶ 21,150 (1976) (hereinafter cited as *A & P*). The Commission found that A & P violated § 2(f) of the Robinson-Patman Act, as amended, 15 U.S.C. § 13(f)[1] by knowingly inducing or receiving illegal price discriminations from The Borden Company (Borden) in the purchase of "private label" milk in the Chicago area from 1965 through 1972. We deny the petition.

Now in its seventh year of litigation, this case has developed a voluminous record and thorough arguments and briefs by both sides. The Commission has succinctly set out the underlying facts in its extensive opinion, *A & P,* —— F.T.C. at ——, ¶ 21,150 at 21,039–40. The case arose from A & P's attempt in the mid-1960's to secure savings in its dairy products business by switching from selling "brand label" milk in its stores (*e. g.,* milk sold under the brand name of the supplying dairy) to selling "private label" milk (*e. g.* milk sold under the A & P label). Pursuant to directions from A & P's headquarters in New York, A & P's "Chicago Unit,"[2] made up of over 200 A & P stores in northern Illinois, plus about 35 in neighboring portions of northwestern Indiana and a few stores in Iowa, began negotiations with Borden for the supply of A & P private label milk and other dairy products. In August of 1965, Borden submitted a bid, premised on A & P's acceptance of limited delivery service, which Borden claimed would have reduced A & P's annual dairy costs by $410,000. Not content with this offer, A & P sought and received a lower bid from a competing diary, Bowman Dairy (Bowman).

Armed with a lower bid, A & P turned its attention back to Borden (contrary to its

---

* Sitting by designation.

1. 15 U.S.C. § 13(f) provides:
 "It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section."
 15 U.S.C. § 13(a) and (b), provided in pertinent part:
 "(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered . . ."

 "(b) Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

2. A & P states in its Brief in this appeal that its Chicago Unit was one of 32 similar "Units" reporting to seven "Divisions," into which A & P had grouped its over 4,000 retail grocery stores.

usual practice, which is to allow only one bid from a supplier, *A & P,* —— F.T.C. at ——, ¶ 21,150 at 21,039). Elmer Schmidt, A & P's Chicago Unit buyer, telephoned Borden's Chicago chain store sales manager, Gordon Tarr, and told him that Borden's initial offer was not "in the ball park." Pressed for details as to what would be "in the ball park," Schmidt told Tarr that a $50,000 improvement "would not be a drop in the pocket." Borden then had to decide whether to re-bid. At the time, A & P was one of Borden's major customers in the Chicago area. In addition, Borden had just invested over five million dollars in a new dairy processing facility in Woodstock, Illinois; losing the A & P account would have confronted Borden with the inefficient use of the new plant. Ralph Minkler, President of Borden's Chicago Central District, testified before the Administrative Law Judge that he was told by his superiors to "save the [A & P] business." Accordingly, Borden offered to double A & P's expected annual savings under a private label program to $820,000. Minkler emphasized to A & P's Schmidt at the time this second bid was offered that it was being made only to meet the rival Bowman bid and that Borden knew "of no other way to justify this." Before accepting the second and final Borden bid, A & P's Schmidt requested a letter from Borden to the effect that the prices being offered A & P were proportionally available to others. Borden's "availability letter" stated only that it felt its prices were proper under applicable law and that it was prepared to defend them.

The second Borden bid was then reviewed by Herschel Smith, A & P's National Director of Purchases in New York. Smith testified that at the time, he regarded the second Borden bid as "substantially better" than the Bowman bid. As for Borden's "availability letter," Smith testified that he did not initially understand Borden's letter to mean that other Borden customers could enjoy proportionally lower prices such as those agreed upon with A & P, but that after consultation with a Mr. Archer (who had no recollection of such a discussion) he became convinced that Borden's letter was one of availability for all customers. After review by A & P's legal department, the second and final Borden bid was accepted by A & P. Borden began serving A & P in the Chicago area with private label dairy products in November of 1965.

The above constitute the factual nucleus of the three-count complaint filed against A & P in 1971. Count I charged A & P with misleading Borden in the course of negotiations for the private label contract, in that A & P allegedly failed to inform Borden that its second and final bid had not merely "met", but substantially "beaten," Bowman's competitive bid. Such conduct by A & P was said to constitute a violation of § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, along with the policy of the Robinson-Patman Act, 15 U.S.C. § 13. Count II, based on the same conduct by A & P, charged a violation of § 2(f) of the Robinson-Patman Act, 15 U.S.C. § 13(f)[3] (knowing inducement or reception by A & P of price discriminations from Borden which are in turn prohibited by § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a)). Finally, Count III charged a combination of A & P and Borden to stabilize and maintain the retail and wholesale prices of milk and other dairy products, contrary to § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

Following an extended discovery period and hearing, the latter extending over 110 days, the Administrative Law Judge found that as to Count I, A & P "ha[d] acted unfairly and deceptively" in accepting a price offer from Borden offered to meet competition from Bowman Dairy, "when in fact such [a] meeting-competition-defense[4] was not available and without informing Borden of this fact in violation of the policy

---

3. Quoted in note 1, *supra.*

4. The "meeting competition" defense to a charge of price discrimination, as incorporated

in 15 U.S.C. § 13(b), quoted at note 1, *supra,* is available to both buyers and sellers when charged with violations of the Robinson-Patman Act, 15 U.S.C. § 13.

of Section 2 of the amended Clayton Act [the Robinson-Patman Act] and in violation of Section 5 of the Federal Trade Commission Act.". Likewise as to Count II, A & P was found to have violated § 2(f) of the Robinson-Patman Act, 15 U.S.C. § 13(f), in knowingly inducing or receiving price discriminations in the purchase of fluid milk and other dairy products. As to Count III, however, which had charged a combination to stabilize and maintain milk prices between A & P and Borden, the Administrative Law Judge held that the FTC had not satisfied its burden of proof. Accordingly, Count III was dismissed.

On review by the Commission, the Administrative Law Judge's holding as to Count I, grounded on A & P's alleged deceptive practices in bargaining with Borden, was reversed. The Commission characterized the charge as "directed to the question of what must legally be disclosed during contract negotiations." *A & P*, —— F.T.C. at ——, ¶ 21,150 at 21,040. That is, knowing that Borden's final bid was substantially better than Bowman's bid and also knowing that Borden would defend the legality of its bid, if necessary, on the ground that it was merely attempting to meet, but not beat, a competitor's bid from Bowman Dairy, A & P refrained from affirmatively disclosing to Borden the terms of Bowman's bid and accepted the Borden offer. The Commission did not agree with the Administrative Law Judge that such behavior constituted an unfair trade practice under the Federal Trade Commission Act, 15 U.S.C. § 45, primarily because such a holding would be "contrary to normal business practice and we think, contrary to the public interest." *A & P*, —— F.T.C. at ——, ¶ 21,150 at 21,040.

In spite of the above holding as to Count I, the Commission nonetheless affirmed the finding of A & P's liability under § 2(f) of the Robinson-Patman Act, 15 U.S.C. § 13(f), ruling that (1) the sales by Borden to A & P had met the statute's jurisdictional requirements that at least one purchase said to involve price discriminations "in com-

merce"; (2) that the evidence demonstrated the presence of price discriminations, which resulted in competitive injury, *A & P*, —— F.T.C. at ——, ¶ 21,150 at 21,042–43; and (3) by virtue of its trade experience and common sense, A & P "knew or should have known that it was the beneficiary of a price discrimination having the requisite harmful competitive effects." *Id.* at ——, ¶ 21,150 at 21,043.

A & P had interposed two defenses to this charge of illegal price discrimination, the first of which was that it was protected from § 2(f) liability through 15 U.S.C. § 13(b),[5] which allows a *seller* charged with giving illegally discriminatory prices to rebut a *prima facie* case by showing that the lower price afforded a purchaser was "made in good faith to meet an equally low price of a competitor." The Supreme Court has ruled in *Automatic Canteen v. FTC*, 346 U.S. 61, 74, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953), that a buyer charged under § 2(f) is not liable if the prices he induces are either within the "meeting competition" defense of the seller or not known by the buyer not to be within one of those defenses. A & P argued that the final Borden bid had been submitted by Borden in a good faith effort to meet an equally low price of a competitor (here, Bowman Dairy) and A & P was therefore unaware that Borden's bid could not be protected by the seller's "meeting competition" defense. That is, transferring Borden's potential "meeting competition" defense to A & P, the purchaser could not be held liable. Following *Kroger Co. v. FTC*, 438 F.2d 1372 (6th Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 59, 30 L.Ed.2d 115 (1971), however, the Commission ruled that:

> "[W]hen a buyer is charged with violating Section 2(f) [15 U.S.C. § 13(f)], the price he induces must come within the meeting competition defense not only from the seller's point of view but also from the buyer's." *A & P*, —— F.T.C. at ——, ¶ 21,150 at 21,043.

The mere fact that had Borden been charged with giving illegal price discrimina-

5. Quoted in note 1, *supra*.

tions under § 2(a) (which it was not), it *could* have defended on the ground that its final bid was merely a good faith effort to meet what it believed to be Bowman's competitive bid, was not sufficient in the Commission's view, to absolve A & P of any wrongdoing, because A & P was aware of the price terms of *both* Borden's and Bowman's bids and had concluded in 1965 that Borden had substantially beaten its competitor. Also pursuant to its application of *Kroger, supra,* the Commission further ruled against A & P's contentions that it could not be charged with knowingly inducing or receiving illegal price discriminations under § 2(f) of the Robinson-Patman Act, 15 U.S.C. § 13(f), unless Borden had been found to have given such illegal prices under § 2(a) of the same Act, 15 U.S.C. § 13(a). *A & P,* —— F.T.C. at ——, ¶ 21,150 at 21,044.

■ A & P's second defense was grounded on § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a),[6] which exonerates sellers who give discriminatory prices on goods of like grade and quality if the discriminations are justified by the seller's manufacture, sale or delivery cost savings in servicing one purchaser over another. Much like the "meeting competition" defense, the purchaser may defend here on the alternative grounds that the discriminatory prices induced or received were in fact "cost justified" or that the buyer was unaware of the unavailability of that defense to the seller. *Automatic Canteen, supra,* 346 U.S. at 74, 73 S.Ct. 1017, Rowe, *Price Discrimination under the Robinson-Patman Act,* § 14.7 at 438 (1962) (hereinafter cited as *Rowe*). Likewise here, A & P was unsuccessful in establishing its "cost justification" defense. The cost study presented by A & P to show the actual cost justification of Borden's prices was found " 'so defective and inadequate as to furnish no evidentiary basis' to justify the price differential that A & P received for private label products on the basis of Borden's cost savings . . . ." *A & P,* —— F.T.C. at ——, ¶ 21,150 at 21,-047–48. As for A & P's knowledge that

Borden could not justify its prices, the Commission found that FTC counsel had more than met their "initial burden" of showing such knowledge. This conclusion was buttressed by the facts that Borden had submitted its final offer solely on the basis that it was meeting competition, which put A & P on notice of the probable absence of a Borden cost justification defense, Borden's failure to furnish A & P with a clear "letter of availability" (stating that A & P's competitors could enjoy the same prices on a proportional basis), Borden's submission of cost data during the negotiations showing that it would either lose money or make a minimal profit on "private label" sales to A & P, as well as A & P's trade experience. Further, the Commission noted that after Borden had begun servicing A & P with both private label and Borden-label dairy products, Borden had tried to increase prices on its products to cover rising container, labor and social security costs. While accepting price increases on Borden-label products, A & P had initially refused a commensurate increase on private label prices, and notwithstanding the fact that the products were of like grade and quality and that Borden's costs for private and brand label dairy products were virtually the same. *A & P,* —— F.T.C. at ——, ¶ 21,-150 at 21,046–47. In short, A & P's "meeting competition" and "cost justification" defenses failed and it was found to have violated § 2(f) of the Robinson-Patman Act.

As for the third charge against A & P, combining with Borden to stabilize dairy prices, the Administrative Law Judge's dismissal of the count was affirmed by the Commission, because the evidence presented simply did not support the charge that "A & P ever gave Borden the assurance that A & P would not create a price differential at the retail level." *A & P,* —— F.T.C. at ——, ¶ 21,150 at 21,049.

Finally, A & P's claim that it was denied due process of law by the Commission's delay in initiating the proceedings was dismissed on the grounds that any delays were reasonably related to the complexity of the

---

**6.** Quoted in pertinent part in note 1, *supra.*

case and to A & P's own failure to evince any concern for a speedy resolution of the matter. The substantive remedy imposed by the Commission was the nationwide distribution of the Commission's order to its milk and dairy products suppliers as well as placing the burden of going forward with a meeting-competition defense in the future on A & P. A & P unsuccessfully challenged the nationwide scope of the distribution order.

On this appeal, then, the sole remaining issue for our consideration is the Commission's holding that A & P violated § 2(f) of the Robinson-Patman Act, 15 U.S.C. § 13(f), by knowingly inducing or receiving illegally discriminatory prices from Borden. We first take up briefly A & P's jurisdictional objection, as well as the evidentiary basis for the Commission's conclusion, and then move on to the heart of this appeal, A & P's contention that the FTC misapplied the law with respect to its defenses of "meeting competition" and "cost justification".

 A & P's jurisdictional challenge rests on the point that the Robinson-Patman Act prohibits illegal price discriminations only "where either or any of the purchasers involved in such discrimination are *in commerce* . . . ." 15 U.S.C. § 13(a) (emphasis added), and upon A & P's assertion that Borden, in the circumstances of this case, was not in interstate commerce. This language has been interpreted recently in *Gulf Oil Corp. v. Copp Paving Co., Inc.,* 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974), to require *more* than a showing that the allegedly anticompetitive activities "affect commerce" as is the case with an action under § 1 of the Sherman Act, 15 U.S.C. § 1. 419 U.S. at 195, 95 S.Ct. 392. *See, Rowe,* § 4.9 at 78, *et seq.* in *Gulf Oil, supra,* a private antitrust action including Robinson-Patman charges against various *sellers* of liquid asphalt, the Court ruled that the alleged illegally discriminatory sales must have occurred in the course of the seller's interstate activities and that at least one of the sales which, when compared with anoth-

er, gave rise to a price discrimination, must have been made in interstate commerce. 419 U.S. at 195, 95 S.Ct. 392. Applying this test to the situation at hand, where a *buyer* has been charged with inducing or receiving illegally discriminatory prices, the Robinson-Patman Act may be invoked where at least one of the purchases by a buyer engaged in interstate activities, which gave rise to the allegedly illegal price discrimination, was in interstate commerce. In this case, A & P's "Chicago Unit" bought brand and private label milk from Borden for individual A & P stores in both Illinois and Indiana. "[S]ubstantially all of the private label milk sold to A & P came from Borden's Woodstock, Illinois, processing plant. The plant, in turn, acquired approximately 60% of its milk from Wisconsin dairy farmers. *A & P,* —— F.T.C. at ——, ¶ 21,150 at 21,042. While there is no doubt, then, that A & P milk purchases for the chain's Indiana stores were "in commerce" for Robinson-Patman purposes, the only remaining question is whether the Illinois-based stores' purchases from Borden were interstate transactions as well. The Commission concluded that they were, inasmuch as Borden acquired most of its milk from Wisconsin and the raw milk was not substantially altered, chemically or otherwise, by processing at the Woodstock plant. We agree. Much as in *Foremost Dairies v. FTC,* 348 F.2d 674 (5th Cir.), *cert. denied,* 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362 (1965), a prior price discrimination action also involving fluid milk, the milk here passed "in a steady flow from the farms in . . . [Wisconsin] through the . . . [Woodstock, Illinois] processing plant, where it underwent a rather negligible processing operation, which did not change its character appreciably, to the shelves of retail grocery establishments in . . . [the Chicago area]." 348 F.2d at 677 (footnote omitted.) Accordingly, A & P's milk purchases from Borden in both Illinois and Indiana were "in commerce" for purposes of Robinson-Patman . Act jurisdiction,[7] which is thus plainly established.

---

**7.** A & P's argument that as to products other than fluid milk (*i. e.,* cottage cheese, fortified

skim milk, buttermilk, eggnog, onion dip and sour cream) supplied by Borden under the pri-

■ The next issue is whether the Commission made out a *prima facie* violation of § 2(f), 15 U.S.C. § 13(f), by showing the knowing inducement or reception by A & P of illegal price discriminations "where the effect of such discrimination[s] may be substantially to lessen competition or tend to create a monopoly in any line of commerce . . . ." 15 U.S.C. § 13(a). The Commission must show *both, i. e.,* that the prices received by A & P from Borden were lower than its competitors and that A & P knew that the prices it received violated § 2(a), the provision prohibiting the giving of discriminatory prices by sellers. *American Motor Specialties v. FTC,* 278 F.2d 225, 228 (2d Cir.), *cert. denied,* 364 U.S. 884, 81 S.Ct. 169, 5 L.Ed.2d 105 (1960).[8] In *Automatic Canteen, supra,* the court laid stress on the knowledge requirement of § 2(f) proceedings, holding:

> "If the requirement of knowledge in § 2(f) has any significant function, it is to indicate that the buyer whom Congress in the main sought to reach was the one who, knowing full well that there was little likelihood of a defense from the seller, nevertheless proceeded to exert pressure for lower prices." 346 U.S. at 79, 73 S.Ct. at 1027.

■ In reviewing this phase of the case, we are limited by the statutory directive that "[t]he findings of the commission or board as to the facts, if supported by substantial evidence, shall be conclusive." 15 U.S.C. § 21(c). Put another way, "[t]he

appraisal of the evidence and the inferences to be drawn from it are for the Commission, not the courts." *FTC v. A. E. Staley Manufacturing Co.,* 324 U.S. 746, 760, 65 S.Ct. 971, 977, 89 L.Ed. 1338 (1945); *FTC v. Algoma Lumber Co.,* 291 U.S. 67, 73, 54 S.Ct. 315, 78 L.Ed. 655 (1934); *Foremost Dairies v. FTC, supra; Callaghan & Co. v. FTC,* 163 F.2d 359, 372 (2d Cir. 1947). Looking, then, at only some of the evidence presented by the Commission, it is clear that a *prima facie* case of illegal price discriminations knowingly induced or received by a buyer was made out. The Administrative Law Judge's thorough initial decision in this case set out the higher prices paid by A & P's competitors for milk substantially identical to that purchased by A & P under the private label agreement in the Gary-Hammond and Valparaiso areas of Indiana, resulting in price discriminations ranging from 22.5 per cent to 5.9 per cent.

The conclusion that these substantial discriminations were injurious to competition is supported by A & P's admission that fluid milk is one of the most important commodities carried in retail grocery stores and that milk products are "sometimes used as price leaders which are tagged below the normal market price to draw customers to a store where it is hoped the customer will purchase additional products . . . ." A & P also admitted that profit margins have been "notoriously low" in the retail grocery business. Putting these three factors together, the Administrative Law Judge con-

vate A & P label, there was no Robinson-Patman jurisdiction is well-based and correct. These products were chemically changed from their origin as raw milk by a variety of processes and additions at Borden's Woodstock plant. *See, i. e., Red Apple Supermarkets, Inc. v. Deltown Foods, Inc.,* 419 F.Supp. 1256 (S.D. N.Y.1976) (New York producer of Light 'n' Lively Milk, which involves blending dried, non-fat milk solids with raw, whole milk and liquid skim milk, cannot be charged with illegal price discrimination under § 2(a) of the Robinson-Patman Act based on the fact that some of the raw, whole milk used in the production of Light 'n' Lively originated on Pennsylvania farms); *Central Ice Cream Co. v. Golden Rod Ice Cream Co.,* 287 F.2d 265 (7th Cir.), *cert. denied,* 368 U.S. 829, 82 S.Ct. 50, 7 L.Ed.2d 32

(1961) (butterfat used in the manufacture of ice cream, originating in Wisconsin, not sufficient basis to support § 2(a) jurisdiction where ice cream was both manufactured and sold in Illinois.)

8. A similar formulation of the § 2(f) *prima facie* case is as follows:

> "Thus, the buyer's prima facie violation arises upon proof that the discriminatory concession in his favor was sizable enough to create competitive injury, and that furthermore the nature of the discrimination placed him on notice of its probable illegality." (Emphasis in original.) Rowe, *Price Discrimination under the Robinson-Patman Act,* § 14.7, at 438 (1962).

cluded that if A & P's competitors had received the larger discounts obtained by A & P through the private label agreement, they would have increased their net profits and could have been more competitive with A & P. It is, therefore, clear that there was substantial evidence presented to show a " 'reasonable possibility'," *FTC v. Morton Salt Co.*, 334 U.S. 37, 50, 68 S.Ct. 822, 92 L.Ed. 1196 (1948); or probability, *Foremost Dairies, Inc. v. FTC*, 348 F.2d 674, 680–81 (5th Cir.), *cert. denied*, 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362 (1965), of adverse effects on competition.

Turning to the "knowledge" requirement of § 2(f), the Administrative Law Judge was guided by *Automatic Canteen's, supra*, requirement that, to make out a *prima facie* case, the Commission must initially show only that A & P knew that the methods by which it was served and the quantities in which it purchased were the same as in the case of its competitors, or, if the methods or quantities differ, "The Commission must only show that such differences could not give rise to sufficient savings in the cost of manufacture, sale or delivery to justify the price differential, and that the buyer, knowing these were the only differences, should have known that they could not give rise to sufficient cost savings." 346 U.S. at 80, 73 S.Ct. at 1028. The purpose of making such a showing is to demonstrate that the discriminatory prices induced or received by the buyer were not justified by lower costs to the seller and were thus prohibited by § 2(a) of the Robinson-Patman Act. The evidence here showed that A & P was purchasing Borden-label milk at the same prices charged to its competitors, that A & P was no novice in the dairy industry and had discussed pricing patterns in the Chicago area with Borden officials (facts which went towards showing the buyer's "trade experience" referred to in *Automatic Canteen, supra*, 346 U.S. at 79–80, 73 S.Ct. at 1027) and that Borden had informed A & P upon making its final and winning bid that it could not justify its prices on other than a "meeting competition" basis. This last statement, ruled the Administrative Law Judge, placed on A &

P "the duty to inquire to determine whether its prices were legal," citing *Fred Meyer, Inc. v. FTC*, 359 F.2d 351, 365–66 (9th Cir. 1966), *rev'd on other grounds*, 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968). In addition, there was evidence that Borden had provided A & P with cost data during the private label negotiations showing that Borden would incur losses or gain no more than minimal profits on the private label agreement. Further, A & P had resisted cost increases on both Borden label and A & P label milk, after the initiation of the private label service, finally accepting increases on Borden-label milk and proportionately smaller ones on A & P label milk, even though A & P stores were serviced in exactly the same way as to both private label and Borden-label milk. In short, the evidence as to A & P's knowledge that Borden could not cost justify its prices was plainly substantial and may not be disturbed on this petition for review.

Faced with a *prima facie* case of § 2(f) liability, however, the buyer may rebut the charge by resorting to statutory defenses available to sellers. The major defenses are that the lower prices offered were "made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor," 15 U.S.C. § 13(b), (the "meeting competition" defense) and that the lower prices made "only due allowance" for cost differences to the seller in servicing a particular customer, 15 U.S.C. § 13(a) (the "cost justification" defense). In addition, and primarily to give substance to § 2(f)'s requirement that only those illegal prices knowingly induced or received by a buyer can form the basis of buyer liability, the Supreme Court ruled in *Automatic Canteen, supra* :

> "We therefore conclude that a buyer is not liable under § 2(f) if the lower prices he induces are *either* within one of the seller's defenses such as the cost justification *or* not known by him not to be within one of those defenses." 346 U.S. at 74, 73 S.Ct. at 1025. (Emphasis added.)

A & P defended its behavior below by invoking both the "meeting competi-

tion" and "cost justification" defenses. As to the first of these we agree with the Commission that A & P could not assert the "meeting competition" defense because in 1965, at the time of the private label negotiations, A & P concluded that Borden's bid was "'substantially better'" or lower than Bowman's, *A & P*, —— F.T.C. at ——, —— ¶ 21,150 at 21,044. *A & P* also argued that a 1973 comparison of the Borden bid with the Bowman bid disclosed Borden's to be higher. The Commission concluded, however, on the basis of substantial evidence, that Bowman's bid was in fact higher than Borden's. *A & P*, —— F.T.C. at ——, ¶ 21,150 at 21,044. Knowing, therefore, that Borden's final bid not only met, but substantially bettered Bowman's, A & P accepted the prices in question. The Commission's holding and rationale were to a large extent grounded on *Kroger Co. v. FTC*, 438 F.2d 1372 (6th Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 59, 30 L.Ed.2d 115 (1971), another § 2(f) proceeding against a retail grocery chain in which the buyer gave false price information to a seller during negotiations for private label milk service, thereby inducing illegal price discriminations. The seller, Beatrice Foods, was absolved of wrongdoing by the Commission because it was in fact responding in good faith to what it believed to be, but which in fact was not, a competitive bid, *Beatrice Foods*, 76 F.T.C. 719 (1969). The buyer, Kroger Co., however, did not escape liability. The Sixth Circuit ruled that Beatrice's absolution from § 2(a) liability did not *ipso facto* exonerate Kroger because *Automatic Canteen, supra*, did not warrant such a result and "[t]o hold otherwise in this case would put a premium on the buyer's artifice and cunning in inducing discriminatory prices." 438 F.2d at 1377. The court went on to rule:

> "In order for the buyer to be sheltered through the exoneration of the seller under section 2(b) the prices induced must come within the defenses of that section not only from the seller's point of view but also from that of the buyer." *Id.*

■ In support of its petition for review, A & P first argues that under *Auto-*

*matic Canteen, supra*, it was entitled to a "meeting competition" defense because it had every reason to believe that had Borden been charged with knowingly giving illegally discriminatory prices (it was not, pursuant to the Commission's discretion, *see FTC v. Universal-Rundle Corp.*, 387 U.S. 244, 251, 87 S.Ct. 1622, 18 L.Ed.2d 749 (1967)), it could have successfully pled its good faith effort to meet Bowman's allegedly competitive bid. We do not agree. While Borden may well have been *under the impression* that the terms of its final offer merely met the Bowman bid, A & P knew *for a fact* that the final Borden bid was substantially below "meeting competition" and beat the Bowman bid by a good margin. As A & P itself recognizes, the Supreme Court in *Automatic Canteen* interpreted Congress' intent in enacting § 2(f) as seeking to reach those buyers who, knowing full well of the little likelihood of a defense for the seller, "nevertheless proceeded to exert pressure for lower prices." 346 U.S. at 79, 73 S.Ct. at 1027. A & P became one of the buyers Congress was concerned with, when it pressured Borden into a second bid which in fact went beyond the bounds of "meeting competition" and went a long way below it. In short, the Sixth Circuit's rule in *Kroger* that where, in a § 2(f) proceeding, the buyer interposes a "meeting competition" defense, the facts must be viewed from the point of view of the buyer as well as that of the seller, is consistent with *Automatic Canteen's supra*, maxim that buyers may induce or receive prices, which sellers can *in fact* offer, consistent with the Robinson-Patman Act. 346 U.S. at 70–71, 73 S.Ct. 1017. Here, Borden's final bid was not *in fact* sheltered by the "meeting competition" defense. *See*, Curtis, *Buyer Liability under The Robinson-Patman Act*, 42 ABA Antitrust L.J. 345, 351–2 (1973).

Indeed, to rule otherwise would emasculate *Automatic Canteen, supra*, and the purpose of § 2(f) in that large buyers could consistently play one seller off against another to the point where all bids are below sellers' costs and then in reliance upon the sellers' potential good faith and its "meet-

ing competition" defenses, thus vindicate the final price. Such tactics would ultimately result in the acquisition of increased, and perhaps overwhelming, market power by the large buyer, all to the ultimate competitive detriment of the buyer's competitors. In addition, toleration of such abusive behavior by buyers would, in most cases, favor the largest seller, the ones most able to bear the losses resulting from such a competitive situation, with the further result of ultimate anticompetitive effects among sellers. *See generally, Rowe, supra,* § 2.1 at 28. That is, in the situation where the seller is unaware of what the buyer is doing (admittedly the rare case), the seller would, in effect, be engaging in predatory price cutting without his knowledge. While the seller may legally escape § 2(a) liability in such a situation because of an assumed "meeting competition" defense, adopting A & P's argument in this case would not be, in the final analysis, in the public interest. As noted by the Supreme Court in *Utah Pie Co. v. Continental Baking,* 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967), a suit under §§ 1 and 2 of the Sherman Act and § 2(a) of the Robinson-Patman Act, "the [Robinson-Patman] Act reaches price discrimination that erodes competition as much as it does price discrimination that is intended to have immediate destructive impact." 386 U.S. at 703, 87 S.Ct. at 1336.

A & P's views regarding the buyer's use of a "meeting competition" defense contrast sharply with the legislative origins of the defense under § 2 of the Clayton Act of 1914. Congress was concerned on the one hand with the seller's ability to defend himself against local competition without having to cut prices in all areas where it did business, and on the other with the position of a seller trying to enter a new territory by cutting prices only locally. H.Rep.No. 627, 63rd Cong., 2d Sess., pt. 2, at 2–3 (1914); *Rowe, supra,* § 9.1 at 208–9.

A & P goes on to argue, however, that even if we find *Kroger, supra,* persuasive, it should not be followed in this case, because the Kroger Co. had been found to be a "lying buyer" in its negotiations with Bea-

trice, while in the present controversy, A & P has been exonerated under § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, for its behavior during negotiations with Borden. This argument is extended to include the assertion that it is simply inconsistent for the Commission to exonerate A & P from charges of unfair trade practices and still hold it liable for a § 2(f) violation. The net effect of this resolution, argues A & P, would be nonetheless to require buyers in the future affirmatively to disclose to a bidder that its bid had not only met, but substantially beaten, that of a competitor. Such a result would allegedly run counter to the public interest in vigorous and competitive price bargaining.

Again we reject these superficially attractive arguments. While *Kroger* did indeed involve a "lying buyer," we do not regard the Sixth Circuit's ruling as strictly limited to the situation where the charged buyer affirmatively lied to the seller. The rule that the "meeting competition" defense must be looked at from the buyer's perspective where the buyer is charged under § 2(f) is a salutary and correct one, whether the buyer lies or merely keeps quiet about the nature of the competing bid it has already been offered, for the policy reasons stated *supra.* Further, the line between affirmative misrepresentation, as in *Kroger,* and the present case, where Borden was told it was not "in the ball park" and that a $50,000 reduction would not be a "drop in the pocket", is a fine one indeed. *Kroger* is, therefore, relevant to the present controversy and its sound reasoning must be applied here.

The seeming inconsistency between a finding of § 2(f) liability and exoneration under a charge of unfair trade practices is, in turn, more apparent than real. One commentator recently opined with regard to this very case that "Section 5 [of the Federal Trade Commission Act, 15 U.S.C. § 45] should not be used for reaching instances of price discrimination which are covered (either explicitly included or excluded) by the Robinson-Patman Act." Reeves, *Toward a Coherent Antitrust Policy: The Role of*

*Section 5 of the Federal Trade Commission Act in Price Discrimination Regulation,* 16 B.C. Ind. & Comm.L.Rev. 151, 198 (1975).[9] That is, where a § 2(f) violation can be made out by sufficient competent evidence, there is neither need nor reason to invoke the Federal Trade Commission Act. While we express no opinion as to when and under what circumstances the Commission may or may not charge a violation of the Federal Trade Commission Act,[10] the point here is that A & P's liability under § 2(f) must be independently assessed without regard to any other statute, so that a finding that A & P has not engaged in unfair trade practices does not, *ipso facto,* absolve A & P under § 2(f).

We hold that in this case and under these circumstances, the Commission properly deprived A & P of Borden's potential "meeting competition" defense.

 Turning then to the "cost justification" defense, it is now settled that a buyer charged under § 2(f) may defend on the alternative grounds that the prices induced or received were in fact cost justified to the seller or that the buyer did not know or could not reasonably have known that the prices were not cost justified to the seller. *Automatic Canteen, supra,* 346 U.S. at 74, 73 S.Ct. 1017. A & P attempted to defend on the first ground of the "cost justification" defense through three cost studies, which purported to show that Borden's final offer was within its costs. The methodology and underlying bases of these studies were analyzed at length by the Administrative Law Judge, who concluded that:

> "A & P's cost justification studies . . . are so defective and inadequate as to furnish no evidentiary basis for justifying A & P's preferential price for private label items on the basis of Borden's savings in cost."

The above conclusion was adopted by the Commission, *A & P,* —— F.T.C. at ——,

¶ 21,150 at 21,047–48. The A & P studies were flawed in a variety of respects, many of which were attributable to the preparer's unfamiliarity with Borden's operations in the Chicago area. For example, as to delivery costs, the largest single expense item after the direct material costs of dairy products, the Administrative Law Judge excluded A & P's studies because they were originally based on wholesale milk delivery time standards prepared by the management consulting firm of Case & Co., and the underlying data supporting the conclusions reached on these studies was not produced. Further, the computation of Borden's processing costs at its Woodstock, Illinois facility was likewise flawed; instead of computing those costs directly, A & P's cost analyst first determined "unit cost" at Borden's two Wisconsin dairies and then multiplied by the number of units produced at the Woodstock plant to arrive at total Woodstock cost, assuming Wisconsin unit costs. The final figure was adjusted to reflect the fact that the Woodstock plant had higher labor costs but lower non-labor costs than the Wisconsin plants. The Commission agreed with the Administrative Law Judge that such a roundabout method of cost computation was not "reliable."

A & P nonetheless argues that the Commission acted improperly in rejecting its cost studies, in that they were made in good faith and in accordance with sound accounting principles, entitling them to "a very great weight." *Minneapolis-Honeywell Regulatory Co.,* 44 F.T.C. 351, 394 (1948). While it is, of course, true that a cost study will not be invalidated merely because one method of computation was used over another, *FTC v. Standard Motor Products Inc.,* 371 F.2d 613, 622 (2d Cir. 1967), for to do so would be to place unfair strictures on the party preparing the cost study where one method of computation is as fair and accurate as the next, the problems with the instant studies are that they were at some

---

**9.** The Reeves article discusses only the FTC's complaint in the present case and was published prior to the Administrative Law Judge's initial decision in the case.

**10.** For an excellent analysis and summary of past and present FTC practice under § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, see Rice, *Consumer Transactions,* Ch. 8 (1975).

points internally inconsistent and at others simply inaccurate, *A & P,* —— F.T.C. at ——, ¶ 21,150 at 21,048. The net result of A & P's efforts could not, therefore, be relied on.

 Thus, A & P was unsuccessful in showing that Borden's final prices for private label milk were cost justified in fact, the first ground of the "cost justification" defense. On the other hand, the Commission did not itself submit a cost study to show the absence of cost justification.[11] A finding of § 2(f) liability, therefore, has been arrived at without a square holding as to the factual absence of cost justification. This seemingly anomalous situation is naturally seized upon by A & P, which argues that the Commission's decision "stand[s] *Automatic Canteen* on its head" by assuming that the FTC "can show that the buyer was 'reasonably aware' that the prices were not cost justified without showing that they were in fact, not cost justified." Our reading of *Automatic Canteen, supra,* does not, however, support the proposition that the Commission must, in all cases, show as part of its *prima facie* case that the prices induced or received by the buyer were not in fact cost justified.

In *Automatic Canteen, supra,* the Court rejected the FTC's contention that a *prima facie* case of § 2(f) liability was made out where price differentials were shown and where the buyer knew "only that the prices are lower than those offered other buyers." 346 U.S. at 71, 73 S.Ct. at 1023. In giving content to the § 2(f) requirement that the prices induced or received by the buyer must be knowingly in violation of § 2(a), however, the Court refrained from the opposite, and equally extreme, position, namely that the Commission must always prove the absence of cost justification in fact.

Charting, instead, a middle course based both on the statutory requirement of knowledge and on the difficulties of proof as regards cost justification, 346 U.S. at 79, 73 S.Ct. 1017, the Court required the FTC henceforth to go forward with some evidence that the buyer knew that the discriminatory prices it was receiving could not be cost justified, including but not limited to, the buyer's trade experience in a particular situation. 346 U.S. at 79–80, 73 S.Ct. 1017. See Galanti, *Buyer Liability for Inducing or Receiving Discriminatory Prices, Terms, and Promotional Allowances: Caveat Emptor in the 1970's,* 7 Ind.L.Rev. 962, 989–90 (1974). Consistent with its view that "[e]nforcement of the provisions of § 2(f) against such a buyer should not be difficult," 346 U.S. at 79, 73 S.Ct. at 1027, however, the Court made no mention of a requirement that the FTC show the absence of cost justification in fact through its own cost study.

This is not the first time that an argument similar to A & P's has been advanced. In *Fred Meyer, Inc. v. FTC,* 359 F.2d 351 (9th Cir. 1966), *rev'd on other grounds,* 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968), the Commission's first § 2(f) proceeding against an individual buyer since *Automatic Canteen, supra;* Note, *The Evolving Duty of an Innocent Buyer to Inquire into His Bargain under Section 2(F) of The Robinson-Patman Act,* 49 Ind.L.J. 348, 357 (1974), an operator of a chain of 13 retail supermarkets was charged under § 2(f) as a result of a promotional scheme which involved a "coupon book." Each coupon entitled the purchaser to a price reduction on a particular product. Advertisers in the book paid a flat fee per coupon page and otherwise underwrote the promotion by volume-based reductions, replacing goods

11. The only other evidentiary material as regards cost justification was the Borden figures disclosed by Joseph Malone, which indicated that Borden would either lose money or make minimal profits on the A & P private label arrangement. The Commission did not consider those figures as a formal cost study, however, *A & P,* —— F.T.C. at ——, n. 25, ¶ 21,150 at 21,046 n. 25, and took them into account only as they served to demonstrate A & P's knowledge of the probability of a lack of cost justification: "Although the [Malone] data may not be completely accurate, it demonstrates that A & P at least had knowledge that the discounts could drastically affect Borden's profits, and therefore, A & P should have inquired whether the prices were available to others. See *Fred Meyer, Inc. v. FTC, supra,* 359 F.2d at 365–67." *A & P,* —— F.T.C. at ——, ¶ 21,150 at 21,046. (Footnote omitted.)

sold or redeeming coupons in cash at an agreed rate. 359 F.2d at 356. The Ninth Circuit ruled that in showing the buyer's knowledge that the price differentials resulting from the coupon promotion could not be cost justified, the FTC had carried its burden by adducing evidence that none of the sellers involved granted quantity discounts, that Meyer itself paid the "going price" of the goods during the 11 months of the year in which there was no promotion and that during the non-promotion months, Meyer paid the same price for the goods as did its competitors. In addition,

"[t]hat the Commission did not prove the costs of the suppliers is immaterial. Costs surveys are expensive and labyrinthine proceedings whose results are often dependent upon the cost accounting theory used. To require them in all proceedings, even against buyers, would too often be an exercise in futility. At least when the facts and the inferences to be drawn are as clear as they are on this point, we think the method of proof adopted by the Commission here is appropriate to its end, that of showing that the buyer 'is not *an unsuspecting recipient* of prohibited discriminations,' *Automatic Canteen, supra,* 346 U.S. at 81, 73 S.Ct. at 1028. (Emphasis added.)" 359 F.2d at 364.

The above considerations are directly relevant to the present case, where the Commission showed, through substantial evidence (as summarized, *supra*) that A & P knew or reasonably should have known that the final price concessions it received from Borden were not cost justified. To require the Commission to submit a formal cost study or other cost-measuring analysis here, in addition to the testimony and other evidence it has already adduced, would go far towards foreclosing the possibility of a § 2(f) proceeding even where all significant indications and factors point to the absence of cost justification and the likelihood of illegal price discriminations. Our result is, therefore, consistent with *Automatic Canteen's* concern with the "balance of convenience" in going forward with evidence in § 2(f) cases, 346 U.S. at 74, 73 S.Ct. 1017, as well as with the public interest in the enforcement of § 2(f).

Having failed in showing actual cost justification, A & P was thus reduced to defending the § 2(f) charge through a showing that it did not know, nor had any reason to know, that Borden's prices could not be cost justified. We have already ruled that the Commission established a *prima facie* showing of A & P's knowledge that the prices in question were *not* cost justified, consistent with its burden of proof on the issue, *Beatrice Foods Co., supra,* 76 F.T.C. at 820; *Suburban Propane Gas Corp.,* 73 F.T.C. 1269, 1274–75 (1968), and thus may be brief in discussing A & P's arguments on this appeal. As set out in the Commission's opinion, A & P's major evidentiary rebuttals to the FTC's *prima facie* showing of knowledge were first, that Borden's letter to A & P after the conclusion of the private label negotiations in which Borden asserted that its prices were "proper under applicable law" and that it was prepared to defend them, was interpreted by A & P to mean that other supermarkets could enjoy the same low prices offered to A & P on a proportionately equal basis. The Commission concluded, however, that the Borden letter did not constitute the "customary assurances" of proportional price availability which led to the reasonable inferences that the prices were not generally available and not cost justified, *A & P, —— F.T.C. at ——, ¶ 21,150 at 21,046.* Such reasonable inferences may not be disturbed on appeal, *FTC v. A. E. Staley Manufacturing Co., supra,* 324 U.S. at 760, 65 S.Ct. at 977. Secondly, the Borden cost study prepared at the time of the private label negotiations and submitted to A & P, which purported to show losses or minimal profits by Borden as a result of private label service, was criticized by A & P as not "completely reliable," *A & P, —— F.T.C. at ——, ¶ 21,150 at 21,047.* Again, while one view of this Borden study is that it was "salesman's talk," designed to impress A & P with the bargain it was being offered, an equally reasonable view, given that A & P did not contemporaneously criticize the study, is that A & P knew as

well as Borden of the illegality of the bargain. Thirdly, in evaluating the reasonableness of Borden's bid, A & P's Smith used a "2–2–2 formula," which reflects the general proposition that "a dairy can profitably sell milk for approximately six cents more per quart than the diary's cost for raw milk." [12] *A & P,* —— F.T.C. at ——, ¶ 21,150 at 21,047 (footnote omitted). The commission concluded that while the use of the formula was relevant to the issue of knowledge, it did not fully rebut the FTC's *prima facie* showing of knowledge.

As to the Commission's *prima facie* showing, A & P makes a variety of arguments, the thrust of which is that the evidence submitted as probative of A & P's knowledge of illegal price discriminations could be easily explained as resulting from quite different factors and motivations. By way of example, the Commission found that after the commencement of private label service in 1975, Borden charged A & P two different prices for private label and Borden-label dairy products, even though, except for a small amount devoted to advertising Borden-label products, there was "no difference in the cost to Borden of private and branded products." *A & P,* —— F.T.C. at ——, ¶ 21,150 at 21,047. From these facts, among others, the Commission inferred that A & P knew that any differences in service were not cost justified. A & P now argues that "[t]he mere fact that Borden's prices to A & P for branded milk (delivered under similar conditions) were higher than for private label should perhaps have made A & P suspicious that the brand label prices were too high, rather than the private label prices were too low." Such an argument essentially invites us to retry the facts and draw new inferences in this case, which we may not do. *FTC v. A. E. Staley Manufacturing Co., supra,* 324 U.S. at 760, 65 S.Ct. 971. A & P's evidentiary and legal arguments as to the "cost justification" defense in support of its petition for review are unpersuasive.

We come to the last ground of the petition, namely that the Commission's final order was unnecessary and unduly broad. The order provided that in the future, A & P bear the burden of going forward with the "meeting competition" defense and also decreed the nationwide distribution of the order to A & P's operating divisions, as well as its suppliers of milk and other dairy products. Our scope of review is here limited by the principles that Congress has placed the primary responsibility for fashioning orders upon the Commission, *FTC v. National Lead Co.,* 352 U.S. 419, 429, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957), and that the courts should not "lightly modify" the Commission's orders, *FTC v. Cement Institute,* 333 U.S. 683, 726, 68 S.Ct. 793, 92 L.Ed. 1010 (1948). *See also, FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 392, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965); *Fedders Corp. v. FTC,* 529 F.2d 1398, 1401–2 (2d Cir.), *cert. denied,* 429 U.S. 818, 97 S.Ct. 63, 50 L.Ed.2d 79 (1976). In addition the Commission has been consistently granted "wide discretion" in choosing a remedy "deemed adequate to cope with the unlawful practices" involved. *Jacob Siegel Co. v. FTC,* 327 U.S. 608, 611, 66 S.Ct. 758, 760, 90 L.Ed. 888 (1946); *FTC v. Mandel Bros.,* 359 U.S. 385, 392, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959); *Fedders Corp. v. FTC, supra,* 529 F.2d at 1401.

With the above in mind, we first take up A & P's argument that the order was in any event unnecessary because A & P voluntarily terminated its private label arrangement with Borden in February of 1972, four months after the issuance of the complaint in this proceeding and over five years ago to date. While it may be true that a long delay in the proceedings, accompanied by significant changes in the market upon which the Commission's order will act, may be sufficient to warrant the remand of a case to the Commission for further evidence as to the present structure of the relevant market, *Columbia Broadcasting System, Inc. v. FTC,* 414 F.2d 974, 981–82 (7th Cir. 1969), *cert. denied,* 397 U.S. 907, 90 S.Ct. 903, 25 L.Ed.2d 88 (1970), the Commission here found that "[t]he dairy and retail

---

**12.** Two cents each are allocated for cartons, plant costs and profits, and delivery costs.

988

food industries have not drastically changed in the last few years." *A & P,* —— F.T.C. at ——, ¶ 21,150 at 21,052. Further, in *Fedders Corp. v. FTC, supra,* a proceeding under § 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), resulting from advertising misrepresentations, the petitioner had discontinued the unlawful activities *prior* to the filing of the Commission's complaint and had given written assurances that it would not resume them. Nonetheless, this court ruled that these factors would not bar a cease-and-desist order "where the public interest otherwise requires it. *Diener's Inc. v. FTC,* 161 U.S. App.D.C. 213, 494 F.2d 1132, 1133 (1974) (per curiam); *Cotherman v. FTC,* 417 F.2d 587, 595 (5th Cir. 1969); *Libbey-Owens-Ford Glass Co. v. FTC,* 352 F.2d 415, 418 (6th Cir. 1965)." 529 F.2d at 1403. Here, of course, the A & P-Borden private label arrangement was abandoned only *after* the filing of the FTC complaint, while the lengthy time span between the filing of the complaint and our review is, in large part, attributable to the complexity of the case as well as the inability of both parties to move this matter along. More important, milk continues to be a major product line for supermarkets while private label milk is commonly carried on the shelves of large supermarkets. As a result, it is clearly in the public interest to enforce the Commission's order.

As to the nationwide scope of the order, A & P argues that the evidence did not show that any A & P officer or employee at the division level or above was "guilty" of even the innocuous conduct alleged in the complaint, so that the order should be limited to A & P's "Chicago Unit." The fact remains, however, that the private label program was initiated by A & P's national headquarters in New York, and A & P's national director of purchases had a direct hand in accepting the final Borden bid here in question. In light of these factors, we cannot say that the Commission abused its "wide discretion," *Jacob Siegel Co. v. FTC, supra,* 327 U.S. at 611, 66 S.Ct. 758, in decreeing the nationwide distribution of the order.

It is also urged that the Commission's order providing that henceforth, A & P must carry the burden of going forward with a "meeting competition" defense is improper in that it shifts the burden of proof from the Commission to the petitioner. By its very terms, however, the order does not affect the burden of proof but only the burden of going forward, a distinction highlighted in *Automatic Canteen, supra.* See, *Rowe, supra,* § 14.7 at 441. In a § 2(f) proceeding, the Commission must continue to carry the burden of proving the knowing inducement or receipt of illegally discriminatory prices.

The petition for review is hereby denied, and enforcement of the order is granted.