# GREAT ATLANTIC & PACIFIC TEA CO., INC. *v.* FEDERAL TRADE COMMISSION

No. 77-654.   Argued December 4, 1978—Decided February 22, 1979

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, BLACKMUN, POWELL, and REHNQUIST, JJ., joined, and in

Parts I, II, and III of which WHITE, J., joined. WHITE, J., filed an opinion concurring in part and dissenting in part, *post,* p. 85. MARSHALL, J., filed an opinion dissenting in part, *post,* p. 85. STEVENS, J., took no part in the consideration or decision of the case.

*Denis McInerney* argued the cause for petitioner. With him on the briefs were *Raymond L. Falls, Jr.,* and *William T. Lifland.*

*Deputy Solicitor General Easterbrook* argued the cause for respondent. With him on the brief were *Solicitor General McCree, Michael N. Sohn, Gerald P. Norton, W. Dennis Cross,* and *Jerold D. Cummins.** 

MR. JUSTICE STEWART delivered the opinion of the Court.

The question presented in this case is whether the petitioner, the Great Atlantic & Pacific Tea Co. (A&P), violated § 2 (f) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13 (f),[1] by knowingly inducing or receiving illegal price discriminations from the Borden Co. (Borden).

---

*Thomas A. Rothwell* and *Arthur H. Brendtson* filed a brief for the Small Business Legislative Council as *amicus curiae.*

[1] Title 15 U. S. C. § 13 (f) provides:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section."

Title 15 U. S. C. §§ 13 (a) and (b) provide in pertinent part:

"(a) . . . It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a

The alleged violation was reflected in a 1965 agreement between A&P and Borden under which Borden undertook to supply "private label" milk to more than 200 A&P stores in a Chicago area that included portions of Illinois and Indiana. This agreement resulted from an effort by A&P to achieve cost savings by switching from the sale of "brand label" milk (milk sold under the brand name of the supplying dairy) to the sale of "private label" milk (milk sold under the A&P label).

To implement this plan, A&P asked Borden, its longtime supplier, to submit an offer to supply under private label certain of A&P's milk and other dairy product requirements. After prolonged negotiations, Borden offered to grant A&P a discount for switching to private-label milk provided A&P would accept limited delivery service. Borden claimed that this offer would save A&P $410,000 a year compared to what it had been paying for its dairy products. A&P, however, was not satisfied with this offer and solicited offers from other

monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered . . . .

"(b) . . . Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor."

dairies. A competitor of Borden, Bowman Dairy, then submitted an offer which was lower than Borden's.[2]

At this point, A&P's Chicago buyer contacted Borden's chain store sales manager and stated: "I have a bid in my pocket. You [Borden] people are so far out of line it is not even funny. You are not even in the ball park." When the Borden representative asked for more details, he was told nothing except that a $50,000 improvement in Borden's bid "would not be a drop in the bucket."

Borden was thus faced with the problem of deciding whether to rebid. A&P at the time was one of Borden's largest customers in the Chicago area. Moreover, Borden had just invested more than $5 million in a new dairy facility in Illinois. The loss of the A&P account would result in underutilization of this new plant. Under these circumstances, Borden decided to submit a new bid which doubled the estimated annual savings to A&P, from $410,000 to $820,000. In presenting its offer, Borden emphasized to A&P that it needed to keep A&P's business and was making the new offer in order to meet Bowman's bid. A&P then accepted Borden's bid after concluding that it was substantially better than Bowman's.

I

Based on these facts, the Federal Trade Commission filed a three-count complaint against A&P. Count I charged that A&P had violated § 5 of the Federal Trade Commission Act by misleading Borden in the course of negotiations for the private-label contract, in that A&P had failed to inform Borden that its second offer was better than the Bowman bid.[3]

---

[2] The Bowman bid would have produced estimated annual savings of approximately $737,000 for A&P as compared with the first Borden bid, which would have produced estimated annual savings of $410,000.

[3] Section 5 (a) of the Federal Trade Commission Act, 38 Stat. 719, as amended, 15 U. S. C. § 45 (a), provides in relevant part:

"(1) Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

Count II, involving the same conduct, charged that A&P had violated § 2 (f) of the Clayton Act, as amended by the Robinson-Patman Act, by knowingly inducing or receiving price discriminations from Borden. Count III charged that Borden and A&P had violated § 5 of the Federal Trade Commission Act by combining to stabilize and maintain the retail and wholesale prices of milk and other dairy products.

An Administrative Law Judge found, after extended discovery and a hearing that lasted over 110 days, that A&P had acted unfairly and deceptively in accepting the second offer from Borden and had therefore violated § 5 of the Federal Trade Commission Act as charged in Count I. The Administrative Law Judge similarly found that this same conduct had violated § 2 (f). Finally, he dismissed Count III on the ground that the Commission had not satisfied its burden of proof.

On review, the Commission reversed the Administrative Law Judge's finding as to Count I. Pointing out that the question at issue was what amount of disclosure is required of the buyer during contract negotiations, the Commission held that the imposition of a duty of affirmative disclosure would be "contrary to normal business practice and, we think, contrary to the public interest." Despite this ruling, however, the Commission held as to Count II that the identical conduct on the part of A&P had violated § 2 (f), finding that Borden had discriminated in price between A&P and its competitors, that the discrimination had been injurious to competition, and that A&P had known or should have known that it was the beneficiary of unlawful price discrimination.[4] The Commission rejected A&P's defenses that the Borden bid had been made to meet competition and was cost justified.[5]

---

[4] The Commission also found that the interstate commerce requirement of § 2 (f) was satisfied.

[5] Under §§ 2 (a) and (b) of the Act, a seller who can establish either that a price differential was cost justified or offered in good faith to meet

A&P filed a petition for review of the Commission's order in the Court of Appeals for the Second Circuit. The court held that substantial evidence supported the findings of the Commission and that as a matter of law A&P could not successfully assert a meeting-competition defense because it, unlike Borden, had known that Borden's offer was better than Bowman's.[6] Finally, the court held that the Commission had correctly determined that A&P had no cost-justification defense. 557 F. 2d 971. Because the judgment of the Court of Appeals raises important issues of federal law, we granted certiorari. 435 U. S. 922.

## II

The Robinson-Patman Act was passed in response to the problem perceived in the increased market power and coercive practices of chainstores and other big buyers that threatened

---

competition has a complete defense to a charge of price discrimination under the Act. *Standard Oil Co.* v. *FTC*, 340 U. S. 231. See n. 1, *supra*.

With respect to the meeting-competition defense, the Commission stated that even though Borden as the seller might have had a meeting-competition defense, A&P as the buyer did not have such a defense because it knew that the bid offered was, in fact, better than the Bowman bid. With respect to the cost-justification defense, the Commission found that Commission counsel had met the initial burden of going forward as required by this Court's decision in *Automatic Canteen Co. of America* v. *FTC*, 346 U. S. 61, and that A&P had not then satisfied its burden of showing that the prices were cost justified, or that it did not know that they were not.

The Commission upheld the Administrative Law Judge's dismissal of Count III of the complaint.

[6] The Court of Appeals, like the Commission, relied on *Kroger Co.* v. *FTC*, 438 F. 2d 1372 (CA6), for the proposition that a buyer can be liable under § 2 (f) of the Act even if the seller has a meeting-competition defense. The *Kroger* case involved a buyer who had made deliberate misrepresentations to a seller in order to induce price concessions. While the Court of Appeals in this case did not find that A&P had made any affirmative misrepresentations, it viewed the distinction between a "lying buyer" and a buyer who knowingly accepts the lower of two bids as without legal significance. See n. 15, *infra*.

the existence of small independent retailers. Notwithstanding this concern with buyers, however, the emphasis of the Act is in § 2 (a), which prohibits price discriminations by sellers. Indeed, the original Patman bill as reported by Committees of both Houses prohibited only seller activity, with no mention of buyer liability.[7] Section 2 (f), making buyers liable for inducing or receiving price discriminations by sellers, was the product of a belated floor amendment near the conclusion of the Senate debates.[8]

As finally enacted, § 2 (f) provides:

> "That it shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price *which is prohibited by this section.*" (Emphasis added.)

Liability under § 2 (f) thus is limited to situations where the price discrimination is one "which is prohibited by this section." While the phrase "this section" refers to the entire § 2 of the Act, only subsections (a) and (b) dealing with seller liability involve discriminations in price. Under the plain meaning of § 2 (f), therefore, a buyer cannot be liable if a prima facie case could not be established against a seller or if the seller has an affirmative defense. In either situation, there is no price discrimination "prohibited by this section." [9]

---

[7] H. R. 8442, 74th Cong., 1st Sess. (1935); S. 3154, 74th Cong., 1st Sess. (1935).

[8] F. Rowe, Price Discrimination Under the Robinson-Patman Act 423 (1962). Section 2 (f) has been described by commentators as an "afterthought." *Id.*, at 421; J. McCord, Commentaries on the Robinson-Patman Act 96 (1969).

[9] Commentators have recognized that a finding of buyer liability under § 2 (f) is dependent on a finding of seller liability under § 2 (a). McCord, *supra,* at 96 ("[Section] 2 (f) cannot be enforced if a prima facie case could not be established against the seller on the basis of the transaction in question under Section 2 (a) or if he could sustain an affirmative defense thereto"); Rowe, *supra,* at 421 ("the legal status of the buyer is derivative from the seller's pricing legality under the Act"); H. Shniderman, Price

The legislative history of § 2 (f) fully confirms the conclusion that buyer liability under § 2 (f) is dependent on seller liability under § 2 (a).[10]

The derivative nature of liability under § 2 (f) was recognized by this Court in *Automatic Canteen Co. of America* v. *FTC*, 346 U. S. 61. In that case, the Court stated that even if the Commission has established a prima facie case of price discrimination, a buyer does not violate § 2 (f) if the lower prices received are either within one of the seller's defenses or not known by the buyer not to be within one of those defenses. The Court stated:

> "Thus, at the least, we can be confident in reading the words in § 2 (f), 'a discrimination in price which is prohibited by this section,' as a reference to the substantive prohibitions against discrimination by sellers defined elsewhere in the Act. It is therefore apparent that the discriminatory price that buyers are forbidden by § 2 (f) to induce cannot include price differentials that are not forbidden to sellers in other sections of the Act . . . . For we are not dealing simply with a 'discrimination in price'; the 'discrimination in price' in § 2 (f) must be one 'which is prohibited by this section.' Even if any price differential were to be comprehended within the term 'discrimination in price,' § 2 (f), which speaks of prohibited discriminations, cannot be read as declaring out of bounds price differentials within one or more of the 'defenses' available to sellers, such as that the price differentials

---

Discrimination in Perspective 136 (1977) (a buyer can be liable under § 2 (f) only if the price received "cannot be excused by any defenses provided to the seller").

[10] In presenting the Conference Report to the House, Representative Utterback summarized the meaning of § 2 (f) by stating: "This paragraph makes the buyer liable for knowingly inducing or receiving any discrimination in price which is unlawful under the first paragraph [§ 2 (a)] of the amendment." 80 Cong. Rec. 9419 (1936).

reflect cost differences, fluctuating market conditions, or bona fide attempts to meet competition, as those defenses are set out in the provisos of §§ 2 (a) and 2 (b)." 346 U. S., at 70–71 (footnotes omitted).

The Court thus explicitly recognized that a buyer cannot be held liable under § 2 (f) if the lower prices received are justified by reason of one of the seller's affirmative defenses.

## III

The petitioner, relying on this plain meaning of § 2 (f) and the teaching of the *Automatic Canteen* case, argues that it cannot be liable under § 2 (f) if Borden had a valid meeting-competition defense. The respondent, on the other hand, argues that the petitioner may be liable even assuming that Borden had such a defense. The meeting-competition defense, the respondent' contends, must in these circumstances be judged from the point of view of the buyer. Since A&P knew for a fact that the final Borden bid beat the Bowman bid, it was not entitled to assert the meeting-competition defense even though Borden may have honestly believed that it was simply meeting competition. Recognition of a meeting-competition defense for the buyer in this situation, the respondent argues, would be contrary to the basic purpose of the Robinson-Patman Act to curtail abuses by large buyers.

## A

The short answer to these contentions of the respondent is that Congress did not provide in § 2 (f) that a buyer can be liable even if the seller has a valid defense. The clear language of § 2 (f) states that a buyer can be liable only if he receives a price discrimination "prohibited by this section." If a seller has a valid meeting-competition defense, there is simply no prohibited price discrimination.

A similar attempt to amend the Robinson-Patman Act judicially was rejected by this Court in *FTC* v. *Simplicity Pattern*

*Co.,* 360 U. S. 55. There the Federal Trade Commission had found that a manufacturer of dress patterns had violated § 2 (e) of the Clayton Act, as amended by the Robinson-Patman Act, by providing its larger customers services and facilities not offered its smaller customers.[11] The manufacturer attempted to defend against this charge by asserting that there had been no injury to competition and that its discriminations in services were cost justified. Since liability under § 2 (e), unlike § 2 (a), does not depend upon competitive injury or the absence of a cost-justification defense, the manufacturer's primary argument was that "it would be 'bad law and bad economics' to make discriminations unlawful even where they may be accounted for by cost differentials or where there is no competitive injury." 360 U. S., at 67 (footnote omitted). The Court rejected this argument. Recognizing that "this Court is not in a position to review the economic wisdom of Congress," the Court stated that "[w]e cannot supply what Congress has studiously omitted." *Ibid.* (footnote omitted). The respondent's attempt in the present case to rewrite § 2 (f) to hold a buyer liable even though there is no discrimination in price "prohibited by this section" must be rejected for the same reason.[12]

---

[11] Section 2 (e) provides:

"It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms." 15 U. S. C. § 13 (e).

[12] Contrary to the respondent's suggestion, this interpretation of § 2 (f) is in no way inconsistent with congressional intent. "[T]he buyer whom Congress in the main sought to reach was the one who, knowing full well that there was little likelihood of a defense for the seller, nevertheless proceeded to exert pressure for lower prices." *Automatic Canteen Co. of America* v. *FTC,* 346 U. S., at 79. Here, by contrast, we conclude that a buyer is not liable if the seller *does* have a defense under § 2 (b).

## B

In the *Automatic Canteen* case, the Court warned against interpretations of the Robinson-Patman Act which "extend beyond the prohibitions of the Act and, in so doing, help give rise to a price uniformity and rigidity in open conflict with the purposes of other antitrust legislation." 346 U. S., at 63. Imposition of § 2 (f) liability on the petitioner in this case would lead to just such price uniformity and rigidity.[13]

In a competitive market, uncertainty among sellers will cause them to compete for business by offering buyers lower prices. Because of the evils of collusive action, the Court has held that the exchange of price information by competitors violates the Sherman Act. *United States* v. *Container Corp.,* 393 U. S. 333. Under the view advanced by the respondent, however, a buyer, to avoid liability, must either refuse a seller's bid or at least inform him that his bid has beaten competition. Such a duty of affirmative disclosure would almost inevitably frustrate competitive bidding and, by reducing uncertainty, lead to price matching and anticompetitive cooperation among sellers.[14]

Ironically, the Commission itself, in dismissing the charge under § 5 of the Federal Trade Commission Act in this case, recognized the dangers inherent in a duty of affirmative disclosure:

"The imposition of a duty of affirmative disclosure, applicable to a buyer whenever a seller states that his offer is

---

[13] More than once the Court has stated that the Robinson-Patman Act should be construed consistently with broader policies of the antitrust laws. *United States* v. *United States Gypsum Co.,* 438 U. S. 422; *Automatic Canteen Co. of America* v. *FTC, supra,* at 74.

[14] A duty of affirmative disclosure might also be difficult to enforce. In cases where a seller offers differing quantities or a different quality product, or offers to serve the buyer in a different manner, it might be difficult for the buyer to determine when disclosure is required.

intended to meet competition, is contrary to normal business practice and, we think, contrary to the public interest.

.          .          .          .          .

"We fear a scenario where the seller automatically attaches a meeting competition caveat to every bid. The buyer would then state whether such bid meets, beats, or loses to another bid. The seller would then submit a second, a third, and perhaps a fourth bid until finally he is able to ascertain his competitor's bid." 87 F. T. C. 1047, 1050–1051.

The effect of the finding that the same conduct of the petitioner violated § 2 (f), however, is to impose the same duty of affirmative disclosure which the Commission condemned as anticompetitive, "contrary to the public interest," and "contrary to normal business practice," in dismissing the charge under § 5 of the Federal Trade Commission Act. Neither the Commission nor the Court of Appeals offered any explanation for this apparent anomaly.

As in the *Automatic Canteen* case, we decline to adopt a construction of § 2 (f) that is contrary to its plain meaning and would lead to anticompetitive results. Accordingly, we hold that a buyer who has done no more than accept the lower of two prices competitively offered does not violate § 2 (f) provided the seller has a meeting-competition defense.[15]

---

[15] In *Kroger Co.* v. *FTC,* 438 F. 2d 1372, the Court of Appeals for the Sixth Circuit held that a buyer who induced price concessions by a seller by making deliberate misrepresentations could be liable under § 2 (f) even if the seller has a meeting-competition defense.

This case does not involve a "lying buyer" situation. The complaint issued by the FTC alleged that "A&P accepted the said offer of Borden with knowledge that Borden had granted a substantially lower price than that offered by the only other competitive bidder and without notifying Borden of this fact." The complaint did not allege that Borden's second bid was induced by any misrepresentation. The Court of Appeals recognized that the *Kroger* case involved a "lying buyer," but stated that there

## IV

Because both the Commission and the Court of Appeals proceeded on the assumption that a buyer who accepts the lower of two competitive bids can be liable under § 2 (f) even if the seller has a meeting-competition defense, there was not a specific finding that Borden did in fact have such a defense. But it quite clearly did.

### A

The test for determining when a seller has a valid meeting-competition defense is whether a seller can "show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." *FTC* v. *A. E. Staley Mfg. Co.*, 324 U. S. 746, 759–760. "A good-faith belief, rather than absolute certainty, that a price concession is being offered to meet an equally low price offered by a competitor is sufficient to satisfy the § 2 (b) defense." *United*

---

was no meaningful distinction between the situation where "the buyer lies or merely keeps quiet about the nature of the competing bid." 557 F. 2d 971, 983.

Despite this background, the respondent argues that A&P did engage in misrepresentations and therefore can be found liable as a "lying buyer" under the rationale of the *Kroger* case. The misrepresentation relied upon by the respondent is a statement allegedly made by a representative of A&P to Borden after Borden made its second bid which would have resulted in annual savings to A&P of $820,000. The A&P representative allegedly told Borden to "sharpen your pencil a little bit because you are not quite there." But the Commission itself referred to this comment only to note its irrelevance, and neither the Commission nor the Court of Appeals mentioned it in considering the § 2 (f) charge against A&P. This is quite understandable, since the comment was allegedly made *after* Borden made its second bid and therefore cannot be said to have induced the bid as in the *Kroger* case.

Because A&P was not a "lying buyer," we need not decide whether such a buyer could be liable under § 2 (f) even if the seller has a meeting-competition defense.

*States* v. *United States Gypsum Co.,* 438 U. S. 422, 453.[16] Since good faith, rather than absolute certainty, is the touchstone of the meeting-competition defense, a seller can assert the defense even if it has unknowingly made a bid that in fact not only met but beat his competition. *Id.,* at 454.

## B

Under the circumstances of this case, Borden did act reasonably and in good faith when it made its second bid. The petitioner, despite its longstanding relationship with Borden, was dissatisfied with Borden's first bid and solicited offers from other dairies. The subsequent events are aptly described in the opinion of the Commission:

"Thereafter, on August 31, 1965, A&P received an offer from Bowman Dairy that was lower than Borden's August 13 offer. On or about September 1, 1965, Elmer Schmidt, A&P's Chicago unit buyer, telephoned Gordon Tarr, Borden's Chicago chain store sales manager, and stated, 'I have a bid in my pocket. You [Borden] people are so far out of line it is not even funny. You are not even in the ball park.' Although Tarr asked Schmidt for some details, Schmidt said that he could not tell Tarr anything except that a $50,000 improvement in Borden's bid 'would not be a drop in the [bucket].' Contrary to its usual practice, A&P then offered Borden the oppor-

---

[16] Recognition of the right of a seller to meet a lower competitive price in good faith may be the primary means of reconciling the Robinson-Patman Act with the more general purposes of the antitrust laws of encouraging competition between sellers. As the Court stated in *Standard Oil Co.* v. *FTC,* 340 U. S., at 249:

"We need not now reconcile, in its entirety, the economic theory which underlies the Robinson-Patman Act with that of the Sherman and Clayton Acts. It is enough to say that Congress did not seek by the Robinson-Patman Act either to abolish competition or so radically to curtail it that a seller would have no substantial right of self-defense against a price raid by a competitor."

tunity to submit another bid." 87 F. T. C., at 1048 (Footnotes and record citations omitted.)

Thus, Borden was informed by the petitioner that it was in danger of losing its A&P business in the Chicago area unless it came up with a better offer. It was told that its first offer was "not even in the ball park" and that a $50,000 improvement "would not be a drop in the bucket." In light of Borden's established business relationship with the petitioner, Borden could justifiably conclude that A&P's statements were reliable and that it was necessary to make another bid offering substantial concessions to avoid losing its account with the petitioner.

Borden was unable to ascertain the details of the Bowman bid. It requested more information about the bid from the petitioner, but this request was refused. It could not then attempt to verify the existence and terms of the competing offer from Bowman without risking Sherman Act liability. *United States* v. *United States Gypsum Co., supra.* Faced with a substantial loss of business and unable to find out the precise details of the competing bid, Borden made another offer stating that it was doing so in order to meet competition. Under these circumstances, the conclusion is virtually inescapable that in making that offer Borden acted in a reasonable and good-faith effort to meet its competition, and therefore was entitled to a meeting-competition defense.[17]

---

[17] The facts of this case are thus readily distinguishable from *Corn Products Co.* v. *FTC*, 324 U. S. 726, and *FTC* v. *A. E. Staley Mfg. Co.*, 324 U. S. 746, in both of which the Court held that a seller had failed to establish a meeting-competition defense. In the *Corn Products* case, the only evidence to rebut the prima facie case of price discrimination was testimony by witnesses who had no personal knowledge of the transactions in question. Similarly, in the *Staley Mfg. Co.* case, unsupported testimony from informants of uncertain character and reliability was insufficient to establish the defense. In the present case, by contrast, the source of the information was a person whose reliability was not questioned and who had personal knowledge of the competing bid. Moreover, Borden at-

Since Borden had a meeting-competition defense and thus could not be liable under § 2 (b), the petitioner who did no more than accept that offer cannot be liable under § 2 (f).[18]

Accordingly, the judgment is reversed.

*It is so ordered.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE WHITE, concurring in part and dissenting in part.

I concur in Parts I, II, and III of the Court's opinion, but dissent from Part IV. Because it was thought the issue was irrelevant where the buyer knows that the price offered is lower than necessary to meet competition, neither the Commission nor the Court of Appeals decided whether Borden itself would have had a valid meeting-competition defense. The Court should not decide this question here, but should remand to the Commission, whose job it is initially to consider such matters.

For the reason stated by the Commission and the Court of Appeals, I am also convinced that the United States made a sufficient, unrebutted showing that Borden would not have a cost-justification defense to a Robinson-Patman Act charge.

MR. JUSTICE MARSHALL, dissenting in part.

I agree with the Court that the Federal Trade Commission and the Court of Appeals applied the wrong legal standard in

tempted to investigate by asking A&P for more information about the competing bid. Finally, Borden was faced with a credible threat of a termination of purchases by A&P if it did not make a second offer. All of these factors serve to show that Borden did have a valid meeting-competition defense. See *United States* v. *United States Gypsum Co.,* 438 U. S., at 454.

[18] Because we hold that the petitioner is not liable under § 2 (f), we do not reach the question whether Borden might also have had a cost-justification defense under § 2 (a).

assessing A&P's liability under the Robinson-Patman Act. However, I cannot join the Court's interpretation of § 2 (f) as precluding buyer liability under this Act unless the seller could also be found liable for price discrimination. Neither the language nor the sparse legislative history of § 2 (f) justifies this enervating standard for the determination of buyer liability. To the contrary, the Court's construction disregards the congressional purpose to curtail the coercive practices of chainstores and other large buyers. Having formulated a new legal standard, the Court then applies it here in the first instance rather than remanding the case to the Commission. Given the numerous ambiguities in the record, I believe the Court thereby improperly arrogates to itself the role of the trier of fact.

I

Section 2 (f) provides that "[i]t shall be unlawful for any person . . . knowingly to induce or receive a discrimination in price *which is prohibited by this section."* (Emphasis added.) The Court interprets the italicized language as "plainly meaning" that a buyer can be found liable for knowingly inducing price discrimination only if his seller is first proved liable under §§ 2 (a) and 2 (b). *Ante,* at 76, 81. Under this construction, proceedings involving only the Commission and a buyer will turn upon proof of a seller's liability, and whenever a seller could successfully claim the meeting-competition defense, the buyer must be exonerated.

In my view, the language of § 2 (f) does not compel this circuitous method of establishing buyer liability. Sections 2 (a) and 2 (b) of the Act define the elements of price discrimination and the affirmative defenses available to sellers. When Congress extended liability to buyers who encourage price discrimination, a ready means of defining the prohibition was to rely on the elements and defenses already delineated in §§ 2 (a) and 2 (b). Thus, the phrase "which is prohibited by this section" in § 2 (f) incorporates these elements and

defenses by reference, making them applicable to buyers. So construed, § 2 (f) simply means that the same elements of a prima facie case must be established and the same basic affirmative defenses available, whether buyer or seller liability is in issue. The section does not require that another party actually satisfy all of the conditions of §§ 2 (a) and 2 (b) before buyer liability can even be considered. Determining buyer and seller liability independently, I believe, places less strain on the "plain meaning" of the language of § 2 (f) than does the absolutely derivative standard the majority announces today.

In construing § 2 (f), the Court relies on Congress' delay in adding the section to the final bill and on a remark by Representative Utterback during the legislative debates. *Ante,* at 75–77, and n. 10. The delay provides little logical justification for the Court's interpretation; rather, it more likely reflects Congress' late realization that halting the abusive practices of buyers [1] could not be accomplished solely through imposition of liability on sellers. Representative Utterback's statement, 80 Cong. Rec. 9419 (1936), amounts to a slight paraphrase of § 2 (f) and in no way supports the Court's derivative standard.

I agree with the Court's suggestion, *ante,* at 80, that we must resolve the dilemma confronting a buyer who properly invites a seller to meet a competitor's price and then fortui-

---

[1] See S. Rep. No. 1502, 74th Cong., 2d Sess. (1936); H. R. Rep. No. 2287, 74th Cong., 2d Sess., 3–7, 17 (1936); H. R. Conf. Rep. No. 2951, 74th Cong., 2d Sess. (1936); FTC, Final Report on the Chain-Store Investigation, S. Doc. No. 4, 74th Cong., 1st Sess. (1935); *FTC* v. *Henry Broch & Co.,* 363 U. S. 166, 168–169 (1960); W. Patman, Complete Guide to the Robinson-Patman Act 7–10 (1963); F. Rowe, Price Discrimination Under the Robinson-Patman Act 8–14 (1962). See generally Hearings on Price Discrimination (S. 4171) before a Subcommittee of the Senate Committee on the Judiciary, 74th Cong., 2d Sess. (1936); Hearings on H. R. 8442, H. R. 4995, and H. R. 5062 before the House Committee on the Judiciary, 74th Cong., 1st Sess. (1935).

tously obtains a lower bid. Congress could not have expected the buyer to choose between asking the seller to increase the bid to a specific price or accepting the lower bid and facing liability under § 2 (f). Rather, it must have intended some accommodation for buyers who act in good faith yet receive bids that beat competition. This does not mean, however, that a buyer should be liable under § 2 (f) only if his seller also would be liable. That solution to the buyer's dilemma would enable him to manufacture his own defense by misrepresenting to a seller the response needed to meet a competitor's bid and then allowing the seller to rely in good faith on incorrect information. The Court purports to reserve this "lying buyer" issue, *ante,* at 81–82, n. 15, but the derivative standard it adopts today belies the reservation. If "prohibited by this section" means that a buyer's liability depends on that of the seller, then absent seller liability, the buyer's conduct and bad faith are necessarily irrelevant.

I would hold that under § 2 (f), the Robinson-Patman Act defenses must be available to buyers on the same basic terms as they are to sellers. To be sure, some differences in the nature of the defenses would obtain because of the different bargaining positions of sellers and buyers. With respect to the meeting-competition defense at issue here, a seller can justify a price discrimination by showing that his lower price was offered in "good faith" to meet that of a competitor. *Ante,* at 82–83; *United States* v. *United States Gypsum Co.,* 438 U. S. 422, 450–455 (1978). In my view, a buyer should be able to claim that defense—independently of the seller—if he acted in good faith to induce the seller to meet a competitor's price, regardless of whether the seller's price happens to beat the competitor's. But a buyer who induces the lower bid by misrepresentation should not escape Robinson-Patman Act liability. See *Kroger Co.* v. *FTC,* 438 F. 2d 1372 (CA6) (Clark, J.), cert. denied, 404 U. S. 871 (1971). This definition of the meeting-competition defense both extricates buyers from an impossible dilemma and respects the congressional

intent to prevent buyers from abusing their market power to gain competitive advantage.[2]

Automatic Canteen Co. of America v. FTC, 346 U. S. 61 (1953), is entirely consistent with this interpretation of § 2 (f). The issue there concerned the allocation of "the burden of coming forward with evidence under § 2 (f) of the Act," 346 U. S., at 65, not the precise contours of the elements and defenses that determine the scope of buyer liability. Automatic Canteen's general discussion of § 2 (f)'s substantive requirements, quoted ante, at 77–78, merely explains that the affirmative defenses "available to sellers" must also be available to buyers. Far from pronouncing that buyer liability is derivative, Automatic Canteen began with the observation that § 2 (f) is "roughly the counterpart, as to buyers, of sections of the Act dealing with discrimination by sellers." 346 U.S., at 63 (emphasis added).[3]

---

[2] See S. Rep. No. 1502, 74th Cong., 2d Sess., 3–4, 7 (1936); H. R. Rep. No. 2287, 74th Cong., 2d Sess., 3–7, 14–17 (1936); Patman, supra, at 7–10, 148–151; Rowe, supra, at 8–23.

The Court recently noted in United States v. United States Gypsum Co., 438 U. S. 422, 455 n. 30 (1978), that "[i]t may also turn out that sustained enforcement of § 2 (f) . . . will serve to bolster the credibility of buyers' representations and render reliance thereon by sellers a more reasonable and secure predicate for a finding of good faith under § 2 (b)." (Citation omitted.) But if neither a buyer nor a seller can be liable when the seller relies in good faith on the buyer's misrepresentations, then enforcement of § 2 (f) will not "bolster the credibility" of buyers. Thus, the derivative standard of liability adopted by the Court today is inconsistent with the premise underlying the Court's suggestion in United States Gypsum, see Note, The Supreme Court, 1977 Term, 92 Harv. L. Rev. 57, 288, 291–294 (1978), and it eliminates one means of reassuring sellers that they may rely on buyer representations.

[3] Given this preface to Automatic Canteen, language in that opinion provides little support for the Court's adoption today of a derivative standard with respect to the buyer's meeting-competition defense. Moreover, to the extent the majority believes its resort to literal construction of § 2 (f) forecloses further inquiry, it ignores the broader teaching of Automatic Canteen. That case adopted a common-sense approach for inter-

## II

In my judgment, the numerous ambiguities in the record dictate that this case be remanded to the Commission. The Court, however, avoids a remand by concluding in the first instance that A&P's seller necessarily had a meeting-competition defense.[4] In so doing, the Court usurps the factfinding function best performed by the Commission.[5] Neither the Administrative Law Judge, the Commission, nor the Court of Appeals determined that Borden would have been entitled to claim the meeting-competition defense. Indeed, the Administrative Law Judge suggested the opposite, 87 F. T. C. 962, 1021 (1976), and the Commission stated:

> "We believe that it is very probable that Borden did *not* have such a defense. To have a meeting competition

---

preting the often ambiguous Robinson-Patman Act, tempering a "merely literal reading of the language" with considerations of "fairness and convenience" when necessary to achieve Congress' purpose. 346 U. S., at 79, and n. 23. On that basis, *Automatic Canteen* allocated to the Commission the burden of production regarding a· buyer's cost-justification defense, even though the Commission does not bear that burden in a proceeding against a seller. *Id.*, at 75–76; *FTC* v. *Morton Salt Co.*, 334 U. S. 37, 44–45 (1948). Indeed, the Court's interpretation of § 2 (f) today, which places buyers in the litigating position of their sellers, may also be incompatible with *Automatic Canteen*'s specific holding on the burden of production.

[4] Because the Court reverses the judgment without remanding for further consideration and does not expressly reach the merits of the cost-justification issue raised by A&P, *ante*, at 85 n. 18, I need not address that issue either.

[5] Considering the recent admonition in *United States Gypsum, supra*, at 456 n. 31, that "[t]he case-by-case interpretation and elaboration of the § 2 (b) defense is properly left to the other federal courts and the FTC in the context of concrete fact situations," the Court's action is particularly inappropriate.

While I question the Court's decision to undertake resolution of this factual question, without even determining which party bore the burden of persuasion, I do not understand Part IV of its opinion as purporting to modify in any sense what was said last Term in *United States Gypsum* about the scope of the meeting-competition defense for sellers.

defense, the record must demonstrate the existence of facts which would lead a reasonable and prudent person to conclude that the lower price would, in fact, meet the competitor's price. As noted, Borden had serious doubts concerning whether the competing bid was legal. Specifically, it believed that the other bid only considered direct costs. It should have asked A&P for more information about the competing bid. By not making the request, it was not acting prudently. As the record clearly indicates, A&P had knowledge of Borden's belief that other dairies might submit bids that did not include all costs." 87 F. T. C. 1047, 1057 n. 19 (1976) (citations omitted; emphasis in original).

Furthermore, if the Court truly intends to avoid deciding the "lying buyer" issue, then it should remand the case for determination of whether the exception applies here. Testimony before the Administrative Law Judge directly raised the possibility that A&P misled Borden to believe a still lower price was necessary than Borden had offered when it first responded to the Bowman bid. App. 117a–118a, 123a–124a, 141a–142a.[6] Both the Administrative Law Judge and the

---

[6] The Court's opinion creates the impression that Borden submitted only two proposals, ante, at 81–82, n. 15, 83–84. In fact, A&P induced Borden to make a third proposal, even though the second was already more favorable than Bowman's.

When Borden initially responded to Bowman's bid, the A&P representative rejected Borden's offer on the ground that it included milk sold in glass gallon containers, whereas other bidders supposedly had not included that item. Actually, Bowman's bid had included glass gallons and A&P had subsequently decided against using glass containers. 87 F. T. C. 962, 979 (1976); App. 73a–74a, 116a–118a, 257a–260a, 774a–775a. The effect of forcing Borden to delete milk sold in glass gallons from the proposal without raising the overall bid, was to increase the savings to A&P on other products still covered because part of the promised savings had been derived from the sale of the cheaper glass gallons. See 87 F. T. C., at 979–980. In addition, while Borden was preparing a third proposal to reflect the deletion, A&P suggested that Borden make further price

Commission credited that testimony, see 87 F. T. C., at 979, 1021–1022; 87 F. T. C., at 1049 n. 3, but since evidence of misrepresentation was not material under the standard they applied, there were no clear findings of fact on the point. Under these circumstances, this Court should not attempt to elide such testimony by the unsubstantiated conclusion that Borden's final bid was unaffected by any misrepresentation. *Ante,* at 81–82, n. 15; see n. 6, *supra.*

Accordingly, I dissent from the Court's adoption of a derivative standard for determining buyer liability and its resolution of disputed factual issues without a remand.

---

reductions, saying " 'sharpen your pencil a little bit because you are not quite there.' " App. 118a. As a result, Borden reduced its prices still further to yield additional savings of approximately $5,000 to $8,000. The bid finally accepted by A&P incorporated these price reductions as well as those attributable to the deletion of glass gallons. See *id.,* at 117a–118a, 123a–124a, 141a–142a.