PACECO, INC., a California
Corporation, Plaintiff,

v.

ISHIKAWAJIMA–HARIMA HEAVY IN-
DUSTRIES CO., LTD., Nissho Iwai
American Corp., Hitachi, Ltd., Hitachi
America, Ltd., and I. H. I. Inc., a Dela-
ware Corporation, Defendants.

No. C–78–910 ACW.

United States District Court,
N. D. California.

March 22, 1979.

Harold C. Nachtrieb, Nachtrieb, Williams & Streitz, APC, San Francisco, Cal., for plaintiff.

Shigeru Watanabe, Mori & Ota, John J. Quinn, Kadison, Pfaelzer, Woodard, Quinn & Rossi, Los Angeles, Cal., Robert H. Kreutzer, Morton M. Maneker, Proskauer, Rose, Goetz & Mendelsohn, New York City, John A. Edginton, Graham & James, San Francisco, Cal., for defendants.

## ORDER

WOLLENBERG, District Judge.

This case involves the jurisdictional requirements of Sections 2(a) and 2(f) of the Robinson-Patman Act that deal with buyer and seller liability for acts of price discrimination. The imprecise language of the statute [1] and the incompleteness of the case law has left undetermined the jurisdictional reach of those sections. Plaintiff's unique factual allegations touch upon several open questions that require determination by this Court.

Plaintiff, Paceco, Inc., initially filed this antitrust action on April 25, 1978, against defendants Ishikawajima-Harima Heavy Industries Co., Ltd. ("IHI"), Nissho Iwai American Corp., Hitachi, Ltd. ("Hitachi"), Hitachi America, Ltd., I.H.I. Inc., and Does 1–100. The original complaint alleged several federal antitrust violations and violations of various state statutes. Jurisdiction of this Court was invoked pursuant to 28 U.S.C. § 1337, Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22), and the doctrine of pendent jurisdiction.

On July 24, 1978, the named defendants filed motions pursuant to Rule 12 of the Federal Rules of Civil Procedure seeking to dismiss Counts III, IV, and V of the complaint and to strike references to "Doe" defendants.[2] After further briefing and a hearing, this Court ordered the dismissal of Counts III and V and the striking of the fictitious defendants and granted plaintiff leave to amend Count IV.

In anticipation of the Court's order, plaintiff had filed on September 27, 1978, an amended complaint that incorporated certain paragraphs of the original complaint, deleted others, and added new Counts IVa and IVb which, respectively, charged defendants Hitachi and IHI with violations of Section 2(f) of the Robinson-Patman Act. Subsequently, defendants Hitachi and IHI filed the motion presently before the Court seeking to dismiss these counts under Rule 12(b)(6) of the Federal Rules of Civil Procedure for plaintiff's failure to state a claim.

## FACTS

Plaintiff's complaint alleges the following factual situation. Defendants IHI and Hitachi are Japanese corporations engaged in the manufacture of large steel cranes used at ports for unloading freight containers from ships. Defendants sell those cranes, which are often taller than fifty feet, to ports and shipping companies in the United States. As a domestic manufacturer of similar cranes, plaintiff competes with defendants for American business.

Steel is the principal component of the cranes. The price at which the parties bought their steel gives rise to the price discrimination claim. Defendants purchase their steel directly from various Japanese steel manufacturers. Plaintiff alleges that it acquires steel from these manufacturers, and it is apparent from its pleadings that it is an indirect purchaser who buys this steel from domestic wholesalers.[3] The complaint

---

1. *See F. T. C. v. Fred Meyer*, 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968) ("the Robinson-Patman amendments by no means represent an exemplar of legislative clarity"); and *Automatic Canteen Co. v. F. T. C.*, 346 U.S. 61, 65, 73 S.Ct. 1017, 1020, 97 L.Ed. 1454 (1953) ("precision of expression is not an outstanding characteristic of the Robinson-Patman Act").

2. Defendant IHI also brought a motion for dismissal under Rule 12(b)(5) Fed.R.Civ.P. for insufficiency of process. Plaintiff subsequently complied with the applicable service requirements.

3. Plaintiff's amended complaint states at paragraphs 156 and 183 that certain (named) Japa-

alleges that defendants, as sellers' favored buyers, knew that the price at which they purchased this steel was lower than the price at which the steel manufacturers sold to the United States market, and as a result of this discrimination, defendants consistently outbid plaintiff on domestic contracts.

The parties dispute the method by which the steel is incorporated into the finished product. To what degree the steel is processed at the premises of the crane manufacturer as opposed to the purchaser's chosen locale bears on several issues before the Court. The complaint alleges—and the Court must accept that allegation as true on a motion to dismiss—that defendants ship the steel in a relatively unprocessed state to the United States and assemble and erect the cranes at the purchaser's premises.

## STANDARD OF REVIEW

The Supreme Court set out the standard test used to determine the sufficiency of a complaint in *Conley v. Gibson,* 355 U.S. 41, at 45–46, 78 S.Ct. 99, at 102, 2 L.Ed.2d 80 (1955) when it stated that:

> [I]n appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

On a motion to dismiss, material allegations of the complaint are taken as admitted, and the complaint is to be liberally construed in plaintiff's favor. *Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Kennedy v. H. & M. Landing, Inc.,* 529 F.2d 987 (9th Cir. 1976). The question presented is whether in the light most favorable to plaintiff, and with every doubt resolved in its behalf, the complaint states any valid claim for relief.

nese steel manufacturers "furnish steel of like grade and quality to the United States market which is purchased by Paceco and incorporated

## DISCUSSION

Section 2(f) of the Robinson-Patman Act renders it "unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section." The last clause of that section makes buyer liability dependent upon plaintiff's ability to meet the requirements of Section 2(a) dealing with seller liability. Thus to state a claim based on buyer liability for price discrimination, plaintiff must allege the jurisdictional requirements of Sections 2(a) and (f) of the Act. *See Great Atlantic & Pacific Tea Co. v. F. T. C.,* —— U.S. ——, —— – ——, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979); *Automatic Canteen Co. of America v. F. T. C.,* 346 U.S. 61, 70–71, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953).

Defendants base their motion to dismiss on plaintiff's failure to allege three jurisdictional elements required by those sections. First, they claim that plaintiff's complaint does not cover transactions that have occurred in the course of commerce as required by Section 2(f). Second, they argue that the complaint admits that the commodity allegedly sold at a discriminatory price was not sold "for use, consumption, or resale within the United States" as required by Section 2(a). And, finally, they argue that plaintiff lacks standing to sue because Section 2(a) allows only direct purchasers from the discriminatory seller to prosecute a price discrimination claim.

### 1. Commerce Requirements of Section 2(f)

Defendants claim that the fact that the purchase and delivery of their steel occurred solely within the boundaries of Japan demonstrates that the actions complained of herein do not involve commerce. Commerce, as used in the Clayton Act, which includes Section 2 of the Robinson-Patman Act, refers to trade or commerce among the states and among the states and

into container cranes sold in competition with defendant[s]."

foreign nations.[4] Section 2(f) covers persons "engaged in commerce, [who] in the course of such commerce" commit the proscribed acts. Defendants read this language to require that the discriminatory sale to the buyer must occur in the course of commerce and that since a sale and delivery within Japan does not occur in commerce, plaintiff has failed to state a claim.[5]

Case law demonstrates that transactions that initially or subsequently fail to cross state or international boundaries may still fall within the course of commerce as that term is used in the Robinson-Patman Act. The Supreme Court recently directed that the commerce requirements of the Robinson-Patman Act must be strictly construed; however, the Court noted that seller liability under Section 2(a) extends to activities that occur "in the flow of commerce." *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974).[6] One treatise has described the operation of the flow of commerce test as follows:

> [A] sale across state lines can carry the flow back to the initial shipment of the goods after manufacture and carry the flow forward to transformation or storage in the state of resale, embracing every transaction in between.

P. Areeda & D. Turner, Antitrust Law 1, ¶ 233 (1978). Thus, subsequent transactions that fall within commerce may bring into the flow of commerce earlier transactions that considered on their own would not be viewed as within commerce.

In this case plaintiff argues that defendants' shipment to the United States of the unassembled steel cranes brings their purchases of steel into the flow of commerce. Plaintiff relies on a line of cases holding that the flow of commerce continues through the intrastate aspect of the transaction in cases in which raw materials purchased interstate and sold intrastate are not substantially altered by processing or manufacturing. *See Dean Milk Co. v. F. T. C.*, 395 F.2d 696 (7th Cir. 1968); *Foremost Dairies, Inc. v. F. T. C.*, 348 F.2d 674 (5th Cir.), *cert. denied*, 382 U.S. 959, 86 S.Ct. 435, 15 L.Ed.2d 362 (1965); *Baldwin Hills Building Material Co. v. Fiberboard Paper Products Corp.*, 283 F.Supp. 202 (C.D.Cal.1968). Plaintiff and defendants dispute the degree of processing of the steel that occurs in Japan. Because on a motion to dismiss the Court must resolve every doubt in the plaintiff's behalf, the allegation that the cranes are assembled and erected in the United States and the implication that the steel is not substantially altered in Japan must be accepted as true. On this basis, the Court finds that the complaint sufficiently alleges that defendants' activities fall within commerce.[7]

---

**4.** The term "commerce" is defined in Section 1 of the Clayton Act (15 U.S.C. § 12) as follows:

'Commerce,' as used herein, means trade or commerce among the several States and with foreign nations, or between the District of Columbia or any Territory of the United States and any State, Territory, or foreign nation, or between any insular possessions or other places under the jurisdiction of the United States, or between any such possession or place and any State or Territory of the United States or the District of Columbia or any foreign nation, or within the District of Columbia or any Territory or any insular possession or other place under the jurisdiction of the United States: *Provided,* That nothing in this Act contained shall apply to the Philippine Islands.

**5.** Without referring to any applicable case law, defendants also contend that the "engaged in commerce" language requires an allegation that they purchased the commodity in question from a supplier in the United States. In analyzing commerce questions under the Robinson-Patman Act, courts have exclusively focused on the "in the course of commerce" language. Since defendants' reasoning on this issue simply reformulates their other commerce arguments, the Court rejects this contention without further consideration.

**6.** In *Gulf Oil,* the Court rejected the claims that allegations that certain activities had a "close nexus" to interstate commerce or "affected" interstate commerce would suffice to meet the jurisdictional requirements of Section 2(a) of the Robinson-Patman Act.

**7.** The Court also notes a potential alternative basis for this decision. Defendants claim that the commerce language of Section 2(f) requires that the wrongdoing buyer receive the discriminatory price concession in the course of its commerce. The Court acknowledges that a plain reading of the section supports this argument. On the basis of the Supreme Court's

## 2. The Use, Consumption, or Resale Requirement of Section 2(a)

█ One of the jurisdictional elements of Section 2(a) is that the commodities that are sold at discriminatory prices be sold "for use, consumption, or resale within the United States." Defendants contend that this language requires that commodities sold at *both the higher and lower price* eventually end up in the United States for use, consumption, or resale. They further contend that the complaint only alleges that cranes were sold for use in the United States, but fails to allege that steel—the commodity involved in the discrimination— was used in the United States.

Two district court cases support defendants' interpretation of the statute. In *Zenith Radio Corp. v. Matsushita Electrical Industrial Co.*, 402 F.Supp. 244, 248 (E.D.Pa. 1975), the court held that Section 2(a) would not apply to defendants' sales of consumer products in Japan (at higher prices) and in the United States because the products sold in Japan were not destined for use, consumption, or resale within the United States. Similarly, in *Fimex Corp. v. Barmatic Products, Co.*, 429 F.Supp. 978, 980 (E.D.N.Y.1977), the court held that seller's discriminatory sales to two purchasers within the United States did not violate the Act because one of the purchasers exported for sale abroad all of the products that he bought.

Neither of these cases appear directly relevant to this case. However defendants wish to characterize plaintiff's pleading, they now have ample notice that plaintiff alleges that the steel *was used in the United States* in order to construct the cranes. This issue raises a question of fact not suitable for determination at this stage of the proceedings. Additionally, the subsequent sale of the cranes in the United States with the steel incorporated in that finished product might constitute sufficient use or resale to meet the jurisdictional element in question.

## 3. The Different Purchaser and Competitive Injury Requirements of Section 2(a)

█ Defendants also claim that plaintiff's failure to allege that it purchased the commodity in question *directly* (not through middlemen) from the same discriminatory seller who sold to the favored purchaser necessitates the dismissal of this case.

mandate in *Gulf Oil* to construe strictly the commerce requirements of the Robinson-Patman Act, one circuit court has specifically accepted this interpretation. *Great Atlantic & Pacific Tea Co. v. F. T. C.*, 557 F.2d 971, 979 (2d Cir. 1977), *aff'd on other grounds,* —— U.S. ——, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979).

Limiting buyer liability to those situations in which the buyer has received the discriminatory price concession in the course of its commerce creates an anomaly between buyer and seller liability. *See generally,* Von Kalinowski, Antitrust Laws and Trade Regulation 16D, § 36.04 (1976). Section 2(a) covering seller liability requires only that one of the two sales giving rise to the discrimination—the higher or the lower—be in interstate commerce. *See e. g., Moore v. Mead's Fine Bread Co.*, 348 U.S. 115, 118, 75 S.Ct. 148, 99 L.Ed. 145 (1954); *Foremost Dairies, Inc. v. F. T. C.*, 348 F.2d 674, 677 n.5 (5th Cir. 1965). Thus in a case in which a seller conveys to a favored buyer in a transaction that is wholly intrastate and sells to the disfavored buyer interstate, the buyer could escape liability on jurisdictional grounds whereas the seller in the same transaction would be liable on account of having made one of the two sales interstate. (This situation could arise in the case at hand if the Court determined that defendants substantially altered the steel in Japan.)

This anomaly may be inconsistent with the purposes of Section 2(f). The Supreme Court has recently noted the "derivative nature of liability under § 2(f)" stating that "buyer liability under § 2(f) is dependent on seller liability under § 2(a)." *Great Atlantic & Pacific Tea Co. v. F. T. C.*, —— U.S. ——, 99 S.Ct. at 928, 931 (1979). The brief legislative history of this section indicates that its authors intended to make coextensive buyer and seller liability under the Act. 80 Cong.Rec. 9419 (1936) (remarks of Rep. Utterback). Several commentators have stated that they can conceive of no logical reason why Congress would have intentionally created this exception for favored buyers who purchase intrastate from discriminatory sellers. See Von Kalinowski, Antitrust Laws and Trade Regulation 16D, at § 36.04 (1976) and the authority cited therein. Thus, in order to give effect to the Congressional intent, it might be necessary to read liberally the commerce language of Section 2(f) and hold that that language imposes no additional requirements than those found in Section 2(a).

Plaintiff's ambiguous pleading that certain Japanese steel manufacturers "furnish steel of like grade and quality to the United States market which is purchased by PACECO and incorporated into container cranes sold in competition with defendant[s]," Plaintiff's Amended Complaint at ¶¶ 156 and 183, makes it clear that plaintiff cannot allege that it is a direct purchaser. The Court has determined, however, that Section 2(a) does not bar an indirect purchaser from maintaining a price discrimination suit.

Defendants offer a two-pronged attack in support of their argument. First, they claim that case law incontrovertibly stands for the proposition that only an actual purchaser may sue under Section 2(a). Second, they argue that a party who must purchase the seller's goods through a wholesaler and who is in competition with a direct-buying favored customer of the seller cannot as a matter of law show the competitive injury required by Section 2(a).

With regard to their first claim, defendants have not misstated the bulk of the extant case law. Courts have often stated that only actual purchasers may bring an action under Section 2(a). *See, e. g., Klein v. Lionel Corp.,* 138 F.Supp. 560 (D.Del.), *aff'd,* 237 F.2d 13, 14–15 (3rd Cir. 1956); *Wales Home Remodeling Co. v. Alside Aluminum Corp.,* 443 F.Supp. 908, 911–12 (E.D. Wis.1978). Yet several factors lead to the conclusion that this line of cases does not preclude an indirect purchaser from maintaining such a suit if it alleges that *its wholesaler is a victim of discriminatory pricing* vis-a-vis a competitor of plaintiff.

The case law upon which defendants rely contains key factual differences from this case and indicates no reasons why the actual purchaser rule should not be limited to the facts presented in those cases. The case law generally involves two different factual situations. In the leading case of *Klein v. Lionel Corp.,* 138 F.Supp. 560, at 566 (D.Del.), *aff'd,* 237 F.2d 13 (3rd Cir. 1956), recently relied upon in *Wales Home Remodeling Co. v. Alside Aluminum Corp.,* 443 F.Supp. 908 (E.D.Wis.1978), the court specifically held that:

[A] plaintiff has no cause of action for discrimination under 15 U.S.C.A. Section 13(a) where it appears that plaintiff was not a purchaser from the seller but a retailer purchasing from a jobber.

While *Klein* and *Wales Home* involve the dismissal of price discrimination suits brought by indirect purchasers, they both lack a crucial factual allegation present herein. In both cases plaintiffs did not allege that the wholesaler from whom they purchased suffered price discrimination vis-a-vis the favored purchasers; in fact, it was admitted that the jobbers received the *same price* as the direct-buying competitors of plaintiffs and plaintiffs suffered because of the jobbers' surcharge passed on to them. The gravaman of plaintiffs' claims thus focused on sellers' refusal to deal directly with them. Here, plaintiff alleges that the wholesalers have purchased the steel at discriminatorily high prices vis-a-vis the defendants and that this discrimination—as opposed to seller's legal choice as to whom it would sell directly—has caused it injury.

The other cases cited in support of defendants' proposition deal with a related factual question. The cases upon which *Klein* relies involve situations in which seller has refused to deal with plaintiff either directly or indirectly. See cases cited at 237 F.2d at 14 n.1. Since seller has a right under the Sherman Act to pick its customers, courts have used the "different purchasers" language of Section 2(a) to dismiss cases in which these plaintiffs have sought to characterize this seller action as price discrimination on the legitimate ground that the *refusal to sell case involves only one purchaser.* But this question raises a wholly different issue than that of the case at hand in which there are different purchasers.

A number of factors suggest that these cases, while correct on their facts, have overstated the rule. First, a review of the statute reveals that Section 2(a) does not contain explicit language limiting the right to sue to actual purchasers. The relevant language states:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . .

Courts have focused on the "different purchasers" language in divining the actual purchaser rule. Yet the statute makes no reference to who has the right to maintain a price discrimination suit.

Second, two cases have rejected an across-the-board application of the actual purchaser rule. In *Southern Concrete Co. v. United States Steel Corp.,* 394 F.Supp. 362, 377–78 (N.D.Ga.1975), *aff'd,* 535 F.2d 313 (5th Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977) (appeals taken on other issues), the court rejected the purchaser-standing requirement, directing that a nonpurchaser who was injured by reason of the price discrimination could bring an action under Section 2(a). That court relied on a previous Fifth Circuit case, *Littlejohn v. Shell Oil Co.,* 483 F.2d 1140, *cert. denied,* 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973). There, plaintiff was a gas station operator who alleged that defendants sold gas to consumers at lower prices than it sold it to other gas stations. Plaintiff failed to allege that he bought gas from defendants. The court, in a footnote, rejected the theory that plaintiff lacked standing simply because it was not a purchaser on the ground that one of the purposes of Section 2(a) was to grant protection to a competitor whose business is injured by the discriminatory pricing policies. 483 F.2d at 1143 n.3. Plaintiff had alleged the occurrence of such an injury.

This Court submits that *Littlejohn* properly focuses the inquiry as to who has the right to sue on whom the discriminatory pricing injures. Two Supreme Court cases interpreting the coverage of Sections 2(a) and 2(d) indicate that any statutory construction of the Robinson-Patman Act requires a broad look at the basic purposes of the Act with a view towards ending the injury that results from the proscribed conduct.

In *Perkins v. Standard Oil Co.,* 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969) the Court held that plaintiff, a direct buyer from seller-defendants, could recover damages suffered as a result of a price advantage granted to another buyer from defendant and passed on through two subsidiaries, the final subsidiary being a competitor of plaintiff. The Court's analysis rested on the conclusion that where a plaintiff can show a causal link between a price discrimination violation and an injury that it suffered, recovery of damages is proper "regardless of the 'level' in the chain of distribution on which the injury occurred." 395 U.S. at 648, 89 S.Ct. at 1874.

In *F. T. C. v. Fred Meyer,* 390 U.S. 341, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968), the Court interpreted Section 2(d) of the Act making it unlawful for a supplier in interstate commerce to grant advertising or other sales promotional allowances to one "customer" who resells the supplier's "products or commodities" unless the allowances are " 'available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.' " *Fred Meyer* raised the question of the proper construction of the term "customer." Defendants argued for a narrow construction limiting its scope to customers who were similarly situated in the chain of distribution. Thus when a retailer who was a direct buyer (Fred Meyer) was given a promotional allowance by the supplier but retailers who purchased supplier's goods through a wholesaler were not provided such allowances there would be no violation of the Act. The Court rejected this narrow view. Noting that the purpose of the Act was to protect small retailers who had to compete with big concerns such as Fred Meyer, the Court held that indirect purchasers were "customers" for purposes of Section 2(d).

 While defendants correctly argue that neither *Perkins* nor *Fred Meyer* is directly on point to the question of whether an indirect purchaser may sue under Section 2(f), the cases do indicate that any statutory inquiry regarding the right to

bring an action should focus on the substantive questions of causation and injury.[8] One of the central purposes of the Robinson-Patman amendments was to remedy competitive injury at the secondary level that arises from price discrimination. *See F. T. C. v. Anheuser-Busch, Inc.,* 363 U.S. 536, 543–44, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960); *F. T. C. v. Morton Salt Co.,* 334 U.S. 37, 43, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). Thus if plaintiff, even as an indirect purchaser, can show that it has suffered competitive injury at the secondary level from conduct proscribed under the Act, it has the right to maintain a price discrimination action.

▉ Defendants also argue, however, that an indirect purchaser cannot as a matter of law show that it has suffered competitive injury as required by Section 2(a).[9] Plaintiff has pled that the price discrimination enabled defendants to outbid it and win many domestic contracts. Defendants' contention that plaintiff cannot possibly make such a showing may be reduced to a question of practical economics.

In the leading case of *Secatore's, Inc. v. Esso Standard Oil Co.,* 171 F.Supp. 665 (C.D.Mass.1959), the court held that a supplier may discriminate in price between a retail customer and a consumer customer, giving the latter a lower price, where the retailer would not have been able to compete with the supplier for the business of that consumer customer were he to have been afforded equal price treatment. The basis of this argument is simple: the direct-purchase consumer will purchase a standardized commodity from the cheapest source. If the supplier sells to the retailer at the same price that it offers the consumer, the consumer will buy from the supplier since the retailer will have to add a surplus to make a sale worthwhile. *Secatore's* reasoned that if equality cannot help, and that is all the law requires, then discrimination cannot injure.

Defendants apply that reasoning to this case, arguing that since it is apparent that plaintiff purchases through a middleman while defendants have the legal competitive advantage of direct purchasing, plaintiff cannot be injured even if seller does practice price discrimination.

The problem with a general application of this theory is that the price of the commodity involved in the discriminatory transaction may not be the sole factor in determining competition. In dealing with a standardized product such as gasoline where a retailer acquires it for immediate resale, the price of that commodity plays the determinative role in competition. Yet in the sale of a complicated product like steel cranes, the price of steel is only one factor of an eventual sale. Assuming equality in the price of steel, as sold to defendants and the wholesalers, perhaps plaintiff could show that lower shipping costs, advanced technology, absence of duty payments, cheaper labor costs, etc., would enable it to compete with defendants even if it had to absorb the wholesalers' surcharge on the steel. In *Sano Petroleum Corp. v. American Oil Corp.,* 187 F.Supp. 345, 355 (E.D.N.Y.1960), a case cited by defendants, the court relied on *Secatore's,* but also recognized the limits

---

**8.** *See also, Moore v. Mead's Fine Bread Co.,* 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954), in which the Court held that a plaintiff who maintained an *intrastate* business could bring a price discrimination action against a competitor who maintained prices in interstate transactions but cut prices in intrastate transactions, thereby driving plaintiff out of business. Despite the local nature of the commerce involved, the Court noted that the requisite injury under the Act had occurred—competitive injury at the primary level—and defendant's connections with interstate commerce sufficed to meet Section 2(a)'s jurisdictional requirements.

**9.** The competitive injury requirement of Section 2(a) arises out of the following language of that section:

It shall be unlawful . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . .

of its application. Thus until plaintiff has had an opportunity to show the existence of manufacturing, transportation, or labor efficiencies that would have absorbed the wholesalers' surcharge, the Court would be acting prematurely if it dismissed these claims.

ACCORDINGLY IT IS HEREBY ORDERED that for the reasons stated herein, defendants' motion to dismiss for failure to state a claim is DENIED.